ARCHIE S. ROBINSON [SBN. 34789]
*asr@robinsonwood.com*
JOSHUA J. BORGER [SBN. 231951]
*jjb@robinsonwood.com*
ROBINSON & WOOD, INC.
227 N 1st Street
San Jose, California 95113
Telephone: (408) 298-7120
Facsimile: (408) 298-0477

Attorneys for Defendants
**BLUEBEAT, INC., MEDIA RIGHTS TECHNOLOGIES, INC., BASEBEAT, INC. and HANK RISAN**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CAPITOL RECORDS, LLC, a Delaware limited liability company; CAROLINE RECORDS, INC., a New York Corporation; EMI CHRISTIAN MUSIC GROUP, INC., a California Corporation, PRIORITY RECORDS, LLC, a Delaware limited liability company; VIRGIN RECORDS AMERICA, INC., a California Corporation; and NARADA PRODUCTIONS, INC., a Wisconsin corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>BLUEBEAT, INC., a Delaware corporation, doing business as www.bluebeat.com, MEDIA RIGHTS TECHNOLOGIES, INC., a California corporation; BASEBEAT, INC., a Delaware corporation, doing business as www.basebeat.com and HANK RISAN, an individual; and Does 1 through 10,<br><br>Defendant. | Case No. CV 09 08030 JFW (JCx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Date: November 20, 2009<br>Time: 11:00 a.m.<br>Judge: Hon. John F. Walter<br>Dept.: 16 |

539429

# I.
# INTRODUCTION

Hank Risan, chief executive of Bluebeat, at incalculable expense and effort, spent nine years researching and developing a breakthrough psychoacoustic process that creates original sounds which simulate - - but are different from - - those in copyrighted sound recordings. The result is a musical performance digitally produced within a virtual three dimensional stage environment that provides an impressionistic listening experience closely approximating that of a live musical performance.

The sounds created are not mere copies of original sound recordings. Nor are they re-mastered, re-mixed, or re-formatted sounds from other sound recordings. They are independent, original sounds created by an artistic author.

Mr. Risan's work was not done in a vacuum. Indeed, plaintiffs themselves were participants in the evaluation of Mr. Risan's simulations. Since 2001, Mr. Risan's development has been done under the watchful eye and approval of plaintiffs and their trade association, the Recording Industry Association of America ("RIAA"). Mr. Risan's work has been done under statutory licenses authorizing the making of ephemeral copies of sound recordings and the broadcast of sound recordings over the internet.

Contemporaneously with work on the simulations, Mr. Risan designed, built and ultimately patented the first Secure Copy Management System ("SCMS") that protects internet transmissions from being copied without consent while at the same time insuring royalty payments. Until taken down recently as a result of this litigation, Bluebeat's website had been in operation since 2004. During that time, accurate and complete royalty reports and payments were made to the Sound

Exchange, agent for royalty collection on behalf of the record labels, and to music publishers.[1]

Plaintiffs' request for preliminary injunction should be denied because they are not likely to succeed in establishing infringement on the merits. None of the three exclusive rights claimed by plaintiffs has been infringed by defendants.

First, plaintiffs' exclusive right of reproduction is expressly limited by 17 U.S.C. §112. That section permits a statutory licensee, such as Bluebeat, to make one (ephemeral) copy of a copyrighted sound recording in aid of a licensed webcaster's authorized digital transmission of the sound recording under section 114. As a statutory licensee, Bluebeat was authorized to make ephemeral copies of plaintiffs' sound recordings and did so, as prescribed by the Copyright Act. As will be discussed in detail later, simulations were created from those ephemeral copies, consisting of the independent fixation of other sounds. Those simulations are protected from infringement liability by section 114(b).

Second, plaintiff s exclusive right to distribute has not been infringed by reason of the difference in the sounds between the digital performance delivery of the simulations as compared to the sounds in plaintiffs' copyrighted works.

Third, the exclusive right to publicly perform has not been infringed by Bluebeat's transmission of plaintiffs' copyrighted sound recordings over the internet because such transmissions are authorized by Bluebeat's statutory license. Moreover, the simulations do not infringe plaintiffs' performance right because of the difference between the sounds in the simulations and those in the copyrighted sound recordings.

---

[1] Attached hereto and marked as Exhibit 1 are exemplar royalty reports, showing payment of royalties for transmissions of Beatles sound recordings. A complete computer printout can be produced upon request.

Finally, Plaintiffs' pre-1972 sound recordings fare no better under state law, since simulations containing sounds other than those in plaintiffs' recordings are exempt from liability under California Civil Code §980(a)(2),

Plaintiffs' request for preliminary injunction should be denied.

## II.
## BLUEBEAT'S SIMULATIONS ARE ORIGINAL WORKS OF AUTHORSHIP AND CONTAIN DIFFERENT SOUNDS THAN THOSE IN PLAINTIFFS' COPYRIGHTED WORKS

Mr. Risan began working in psychoacoustics back in the late 1970's while pursuing a Ph.D. in mathematics and neurobiology at the University of California. Later, in 2001, Mr. Risan formed Museum of Musical Instruments ("MOMI") and obtained a statutory license under section 112 and 114 to make ephemeral copies of sound recordings for the purpose of broadcasting them on the internet. Because the quality of sound in commercially sold CD's was of inferior quality at that time, Mr. Risan began experimenting with methods to create new synthetic sounds that simulated original recordings, but contained none of the masking or distortion of the CD's.

From his research and experience, Mr. Risan knew that musical tones produced by instruments or the voice consist of a sequence of time-dependent, pressurized spherical waves that originate from a source point and propagate through the air to the human ear. When received by the ear, these sound waves are converted into electrical action potentials for the brain to process. As a result of the brain's processing, the sounds of a recording are perceived to have certain artistic characteristics. Five of these parameters are pitch,[2] loudness,[3] rhythm,[4] timbre,[5] and space.[6]

---

[2] "Pitch" is perhaps the most significant information in music. This complex parameter is responsible for communicating the artistic message of a musical work. Its components consist of the melodic lines of the work, its chords, its register, and

Every musical sound in a sound recording has a point of origin, called the source point, as well as a capture point, where the sound is affixed.

To create "pure sound" simulations, Mr. Risan purchased CD's of sound recordings over the counter. Ephemeral copies were made, as authorized by the section 112 license, and destroyed shortly thereafter. The original sound recordings were partitioned into segments for observation. The segments were analyzed by an artistic operator who, employing principles of psychoacoustics and advanced harmonic analysis, synthesized an independent parametric model of the sounds. A firewall was utilized to preserve independence between the sounds of the model and those of the original recordings.

Positing assumptions as to the location of the microphone and spatial relationship to the voice and instruments involved in a given recorded performance, the artistic operator then generated and fixed **new** sounds by selecting **new** capture points and **new** source points in a new virtual three-dimensional computer-staged environment . The simulation, thus created, contained new and original spherical source point waves. To determine whether the simulations contained sounds different from those in the original sound recordings, a one second clip of the Beatles song, "Revolution" was played, the output from which was captured and expressed in binary format. The comparable one second clip from Bluebeat's simulation of the same Beatles' song was similarly captured and expressed in binary

---

(cont.)
its range, and in short, its overall tonal organization. The physical dimension of pitch is expressed in terms of "frequency."

[3] "Loudness" is the amplitude of the sound.

[4] "Rhythm" is the length of time the sound is perceived.

[5] "Timbre" is the brain's perception of the overall quality of the sound.

[6] "Space" is the brain's perception of the sound at its source point, *e.g.*, the sound stage.

format. A comparison of the two binary expressions irrefutably shows that they are of different lengths and contain markedly different data sequences. The simulation, therefore, is shown to contain sounds different from the copyrighted recording. (Risan Declaration, pages 4 and 5.)

When propagated to the human ear and processed by the brain, the new sounds contain some parameters, such as loudness and rhythm, that may be perceived to resemble those in the original recordings, while others, like pitch, timbre and space, may be perceived as markedly different. During the process of creating the simulations, all five artistic parameters of sound are adjusted by the human operator. The adjustment is not a mechanical process, but a subjective, interpretive one. The result is an **original** sound recording that embodies the artistic opinion of the operator: a live, original performance within a specially created virtual three-D staging environment. (Risan Declaration, Page 5)

The artistic expression of the simulations contains substantial, not trivial, originality. *Chamberlain v. Uris Sales Corp.*, 150 F.2d at 513 (Second Circuit 1945). The simulations are clearly not copies of original recordings, and owe their creation to their author, Bluebeat, not the owners of copyright on the original recordings. *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d at 102-103 (Second Circuit 1951); *Sheldon v. Metro Golden Pictures*, 81 F.2d 49, 54 (Second Circuit 1936). That the simulations contain appreciable authorship beyond slavish or "sweat of the brow" mechanical reproduction cannot, under the Supreme Court's long-established teachings, be seriously disputed. See *Feist Publications Inc. v. Rural Telephone Service Company, Inc.*, 49 U.S. 340 (1991), *Burrow-Giles Lith. Printing Co. v. Sarony*, 111 U.S. 53 (1884).

The test of originality has a low threshold. "[A]ll that is needed . . . is that the "author" contributed something more than a "merely trivial" variation, something recognizably "his own"." *Alfred Bell*, supra, at 103. (Although "no large measure of novelty needed".)

# III.
# DEVELOPMENT OF SECURE XI AND EVALUATION BY PLAINTIFFS

Mr. Risan designed and built a Secure Copy Management System ("SCMS"), described in Chapter 10 of Title 17 of the United States Code. The purpose of the SCMS, called "Secure XI Recording Control," is to protect digital audio transmissions and audio-visual displays on the internet from being copied without consent. The SCMS also ensures royalty payments by accurately accounting for each transmission of a copyrighted sound recording.

Nondisclosure agreements were entered into by MRT and the major recording labels, including plaintiffs, and the RIAA, as early as 2001, for the purpose of demonstrating the effectiveness of Secure XI. (Risan Declaration, page 6), In January, Mr. Risan personally demonstrated the Bluebeat audio visual display site and delivery methods to the RIAA in Washington, D.C. During this demonstration, Mr. Risan discussed the simulations with the RIAA. (Risan Declaration, page 6)

In March 2002, MRT entered into a software evaluation license with the RIAA and its U.K. parent, IFDI, for the purpose of testing MRT's SCMS. The tests confirmed that he Secure XI was 100% effective. (Risan Declaration, page 6)

In 2004, when the Bluebeat website was ready for launch to the public, but prior to that launch, MRT entered into confidential agreements with major recording labels, including plaintiffs, permitting them to evaluate whether any non-licensed or infringing material was on the site. The labels, including plaintiffs, were given password protected accounts offering private access to Bluebeat's entire site. During this period of evaluation, Mr. Risan disclosed to plaintiffs that the sound recordings Bluebeat intended to transmit were independently created simulations and would be delivered by direct download, limited to a single play as per the encoded management control.

Also, during this evaluation process, plaintiffs, among other labels, requested display of certain background information for each sound recording transmitted by

Bluebeat. The labels requested that the titles of the works and tracks, names of the labels, dates of CDs' first issue and names of composers be displayed in order to promote the works and to insure accurate royalty payment. Further, plaintiffs and the other labels requested that Bluebeat incorporate back – end server meta-data for broadcast transmission verification. This was accomplished at substantial expense to Bluebeat. (Risan Declaration, pages 9-10). The entire Beatles catalog was included in Bluebeat's website during the evaluation by plaintiffs and the other labels. Plaintiffs made no objection to its inclusion.

Since the Bluebeat site has been in operation, all performance royalties payable under Bluebeat's section 112 and 114 licenses as well as all publishing royalties have been paid for each and every digital transmission of sound recording made by Bluebeat.

## IV. PLAINTIFFS' EXCUSIVE RIGHTS HAVE NOT BEEN VIOLATED

### A. Plaintiff's Right of Reproduction is Limited by Section 112

Section 112 of Title 17 provides that "it is not an infringement of copyright for a transmitting organization entitled to transmit to the public a performance or display of a work, under a license, including a statutory license under section 114(f) … to make no more than one copy or phono record of a particular transmission program embodying the performance or display, if – (A) the copy or phonorecord is retained and used solely by the transmitting organization that made it, and no further copies or phonorecords are reproduced from it; and … (C) … the copy or phono record is destroyed within six months from the date the transmission program first transmitted to the public." BlueBeat was authorized to make an ephemeral copy. Mr. Risan limited the ephemeral copies to one per sound recording and destroyed them within six months of the initial transmission. Risan Decl., ¶ 4. Moreover, as has been explained above, the simulations created from the ephermal copies

consisted of the independent fixation of sounds other than those contained in the copyrighted materials. Section 114(b) provides that the exclusive rights to reproduce "do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording." As established above, the simulations are independent fixations of different sounds than those in the copyrighted materials.

### B. The Right to Distribute Has Not Been Infringed

By virtue of the difference in sounds between the simulations and the copyrighted sound recordings, Plaintiff's right to distribute has not been infringed.

### C. The Exclusive Right to Publicly Perform Has Not Been Infringed

Section 114(d) of Title 17 exempts statutory licensees from a finding of infringement of the right of public performance set forth in Section 106(6), provided the transmission is not part of an interactive service. BlueBeat operates as a non-interactive service with respect to digital audio transmissions. See Risan Decl., ¶ __. In the case of BlueBeat's audio visual displays, Section 114(j)(5) places audio visual work outside of the definition of "digital audio transmission."

### D. Defendants Are Not Liable for Infringement Under State Law

Defendants cannot be liable for duplicating or distributing pre-1972 recordings because Civil Code section 980(a)(2) expressly exempts from liability one who "independently makes or duplicates another sound recording that does not directly or indirectly recaptures the actual sounds fixed in such prior sound recording, but consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate the sounds contained in the prior sound recording."

# V.
# CONCLUSION

For the reasons expressed herein, Defendants have created in their simulations sounds other than those contained in the Plaintiffs' copyrighted sound recordings. Defendants possess a statutory license under section 114 which permits the making of ephermal copies from and the transmission of Plaintiffs' copyright sound recordings. The simulations which have been created by Defendants have been proven to contain sounds different than those contained in Plaintiffs' copyrighted recordings.

Plaintiffs are not entitled to injunction relief. The temporary restraining order should be dissolved.

Dated: November 10, 2009          ROBINSON & WOOD, INC.


By: /s/
    ARCHIE S. ROBINSON
    JOSHUA J. BORGER
Attorneys for Defendants
BLUEBEAT, INC., MEDIA RIGHTS
TECHNOLOGIES, INC., BASEBEAT,
INC. and HANK RISAN

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | BLUEBEAT'S SIMULATIONS ARE ORIGINAL WORKS OF AUTHORSHIP AND CONTAIN DIFFERENT SOUNDS THAN THOSE IN PLAINTIFFS' COPYRIGHTED WORKS | 3 |
| III. | DEVELOPMENT OF SECURE XI AND EVALUATION BY PLAINTIFFS | 6 |
| IV. | PLAINTIFFS' EXCUSIVE RIGHTS HAVE NOT BEEN VIOLATED | 7 |
| | A. Plaintiff's Right of Reproduction is Limited by Section 112 | 7 |
| | B. The Right to Distribute Has Not Been Infringed | 8 |
| | C. The Exclusive Right to Publicly Perform Has Not Been Infringed | 8 |
| | D. Defendants Are Not Liable for Infringement Under State Law | 8 |
| V. | CONCLUSION | 9 |

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d at 102-103 (Second Circuit 1951)..................................................................................................5

*Burrow-Giles Lith. Printing Co. v. Sarony*, 111 U.S. 53 (1884)................................5

*Chamberlain v. Uris Sales Corp.*, 150 F.2d at 513 (Second Circuit 1945).................5

*Feist Publications Inc. v. Rural Telephone Service Company, Inc.*, 49 U.S. 340 (1991), ..................................................................................................5

*Sheldon v. Metro Golden Pictures*, 81 F.2d 49, 54 (Second Circuit 1936)................5

**STATE STATUTES**

California Civil Code §980(a)(2) ................................................................................3

**OTHER AUTHORITIES**

17 U.S.C. §112............................................................................................................2