1  ARCHIE S. ROBINSON [SBN. 34789]
      *asr@robinsonwood.com*
2  JOSHUA J. BORGER [SBN. 231951]
      *jjb@robinsonwood.com*
3  ROBINSON & WOOD, INC.
   227 N 1st Street
4  San Jose, California  95113
   Telephone:  (408) 298-7120
5  Facsimile:   (408) 298-0477

6  Attorneys for Defendants
   **BLUEBEAT, INC., MEDIA RIGHTS**
7  **TECHNOLOGIES, INC., BASEBEAT,**
   **INC. and HANK RISAN**

8

9            UNITED STATES DISTRICT COURT

10   CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12  CAPITOL RECORDS, LLC, a                Case No. CV 09 08030 JFW (JCx)
    Delaware limited liability company;
13  CAROLINE RECORDS, INC., a New          **DECLARATION OF HANK RISAN**
    York Corporation; EMI CHRISTIAN        **IN OPPOSITION TO ORDER TO**
14  MUSIC GROUP, INC., a California         **SHOW CAUSE RE PRELIMINARY**
    Corporation, PRIORITY RECORDS,         **INJUNCTION**
15  LLC, a Delaware limited liability
    company; VIRGIN RECORDS               Date:    November 20, 2009
16  AMERICA, INC., a California            Time:    11:00 a.m.
    Corporation; and NARADA               Dept.:   16
17  PRODUCTIONS, INC., a Wisconsin         Judge:  Hon. John F. Walter
    corporation,                          Dept.:   16
18
              Plaintiffs,
19
    vs.
20
    BLUEBEAT, INC., a Delaware
21  corporation, doing business as
    www.bluebeat.com, MEDIA RIGHTS
22  TECHNOLOGIES, INC., a California
    corporation; BASEBEAT, INC., a
23  Delaware corporation, doing business as
    www.basebeat.com and HANK RISAN,
24  an individual; and Does 1 through 10,

25            Defendant.

26

27

28

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY
INJUNCTION

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

I, Hank Risan, have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto. I declare under penalty of perjury that the following is true and correct to the best of my knowledge.

**A.    Background**

1.    I am the Chief Executive Officer for the Museum of Musical Instruments ("MoMI"), incorporated in California in 2000.  I am also the Chief Executive Officer for Media Rights Technologies, Inc. ("MRT"), incorporated in California in 2001,  for BlueBeat.com, Inc., incorporated in Delaware in 2002, and for baseBeat.com, Inc., incorporated in California in 2007.

2.    I hold two bachelor of science degrees from the University of California in Biology and Mathematics with honors.

3.    I began work on psychoacoustic simulation modeling while pursuing joint Ph.D. programs in Mathematics and Neurobiology at the University of California, Berkeley.  I conducted super computer generated scientific simulation modeling of the central nervous system and vertebrates, including aural and visual perception, and transduction (i.e., conversion of sonic waves into electro-chemical nerve impulses) and transmission of nerve impulses.  I conducted synthetic simulation modeling of topology (or physical form) of the human hemoglobin protein, based on its linear DNA sequencing.  Subsequently, at Cambridge University, England, I developed methods and systems by which waveforms of sound could be analyzed and synthesized by use of spherical harmonic models to simulate virtual physical sources of sound, with particular emphasis on generative waveform production of voice and musical instruments in artificial environments.

**B.    Statutory Licenses**

**ROBINSON & WOOD, INC.**
ATTORNEYS AT LAW

539380

2

CV 09 08030 JFW (JCx)

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

4.    In 2002, MoMI obtained section 112[1] and section 114 statutory licenses from the Copyright Office to create ephemeral copies of sound recordings for the purpose of broadcasting on the internet.  Attached hereto and marked as **Exhibit A** is a true and correct copy of MoMI's section 112 and 114 statutory licenses.

1.    Interactive publishing licenses from ASCAP, BMI and SEAC were also obtained for the purpose of paying royalties to composers for the performance of audio visual work displayed on the MoMI site.  The MoMI site is a multimedia educational site that transmits audiovisual displays to the public, featuring history of the guitar and music, primarily in the twentieth century.

## C.    Psychoacoustic Simulation

6.    After obtaining the statutory licenses, I began experimenting with methods of creating synthetic simulations of sound recordings from the single ephemeral copy permitted under section 112.  Because the digitization process used by most record labels in creating their CD's was of inferior quality, the recorded performances were frequently masked and distorted.  This explains why the Beatles Catalog, as sold on CD, has been "re-mastered" at least three times over the past twenty years, with only moderate sonic improvement from the first catalog release.

7.    From my study of psychoacoustics, I learned that musical tones produced by musical instruments or voice consist of a sequence of time-dependent, pressurized spherical waves that originate from a source point and propagate through the air to the human ear.  When received by the ear, these sound waves are converted into electrical action potentials for the brain to process.  As result of the brain's processing, the sounds of a recording are perceived to have certain artistic

---

[1] 17 U.S.C. section 112.  Hereafter all statutory references shall be to Title 17 of the U.S. Code.

**ROBINSON & WOOD, INC.**
ATTORNEYS AT LAW

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1  characteristics.  The five most important of these parameters are pitch[2], loudness[3],
2  rhythm[4], timbre[5], and space[6].

3      Every musical sound in a sound recording has a point of origin, called a
4  source point, as well as a capture point, where the sound is affixed.  To create "pure
5  sound" simulations, I purchased CD's of sound recordings over the counter.  I made
6  one ephermal copy of each recording, as authorized by section 112, destroying same
7  shortly after the simulations were created.  The original sounds were partitioned into
8  segments for observation.  These segments were analyzed by artistic operators who,
9  employing principles of psychoacoustics and advanced harmonic analysis,
10  synthesized an independent parametric model of the sounds.  A firewall was utilized
11  to preserve independence between the sounds of the model and those of the original
12  recording.  I destroyed the ephemeral recording.

13      Positing assumptions as to the location of the microphone and spacial
14  relationship to the voice and instruments involved in a given recorded performance,
15  the artistic operator then generated and fixed **new** sounds by selecting **new** capture
16  points and **new** source points in a **new** virtual three dimensional computer-staged
17  environment.  The simulation, thus created, contained new and original spherical
18  source point waves.

19

20      [2] "Pitch" is perhaps the most significant information in music.  This complex
21  parameter is responsible for communicating the artistic message of a musical work.
22  Its components consist of the melodic lines of the work, its chords, its register, and
   its range, and in short, its overall tonal organization.  The physical dimension of
23  pitch is expressed in terms of "frequency."

24      [3] "Loudness" is the amplitude of the sound.

25      [4] "Rhythm" is the length of time the sound is perceived.

26      [5] "Timbre" is the brain's perception of the overall quality of the sound.

27      [6] "Space" is the brain's perception of the sound at its source point, *e.g.*, the
   sound stage.

28

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

8.    To determine whether there was a difference between the sounds in an original recording and those in a simulation, I copied as a WAV file a one second clip from the re-mastered copy of the famous Beatles song, "Revolution." I then took the comparable one second clip from BlueBeat's simulation in the same WAV format.  Both works were then converted into binary format for review.  I compared the two binary expressions and observed that they were of different lengths and contained markedly different data sequences, indisputably establishing that the two contain sounds which are disparate and dissimilar from one another.  Attached hereto and marked as **Exhibit B**  are the first five pages of the two binary expressions from the two versions of "Revolution."[7] I have also attached, as **Exhibit C** a binary comparison screen shot which displays the differences in red and the similarities in black.

When propagated to the human ear and processed by the brain, the new sounds contain some parameters, such as loudness and rhythm, that may be perceived to resemble those in the original recordings, while others, like pitch, timbre and space may be perceived as markedly different.  During the process of creating the simulations, all five artistic parameters of sound are adjusted by the human operator.  The adjustment is not a mechanical process, but a subjective, interpretative one.  The result is an **original** sound recording that reflects the artistic opinion of the operator:  A live, original performance within a specially created virtual 3-D staging environment.

9.    Between 2002 and 2003, I created and subsequently destroyed more 70,000 psychoacoustic simulations, because they did not meet my artistic expectations of what a live musical performance should sound like.

---

[7] The complete binary print out have 595 and 712 pages respectively.  These complete printouts will be furnished under separate cover

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

**ROBINSON & WOOD, INC.**
ATTORNEYS AT LAW

539380

### D.    Development of Secure X1

10.    In 2001, I began the design and creation of a Secure Copy Management System ("SCMS") as described in Chapter 10 of Title 17.  The SCMS I developed has been called Secure X1 and serves to protect performances of digital audio transmissions and audio visual displays from being serially copied and transmitted over the internet.  I have filed over 60 applications for patent on this technology, and have been awarded five patents by the U.S. Patents Office to date.  Attached hereto as **Exhibit D** are true and correct copies of the first pages of each.

11.    Beginning in late 2002, MRT entered into non-disclosure agreements with the major record labels, including Plaintiffs, and the Recording Industry Association of America ("RIAA"), the labels' trade association.  The purpose of the non-disclosure agreement was to demonstrate the effectiveness of the Secure X1 technology when used at a new broadcasting site, soon to be called BlueBeat.  I personally demonstrated the prototype BlueBeat audio visual display site and delivery methods and discussed psychoacoustic simulation with the RIAA and some of its member companies in Washington, D.C. on January 4, 2003.  Mr. Steve Marks, counsel for RIAA, and Mr. Carlos Garza, CTO of RIAA, were present. Attached and marked hereto as **Exhibit E** are the nondisclosure agreements**.**

12.    By March, 2003, MRT, RIAA and the International Foundation Phonographic Industry ("IFPI"), parent organization of RIAA, had entered into a software evaluation license for the purpose of testing my SCMS to insure royalty payments.  Attached and marked hereto as **Exhibit F,** is the software evaluation license.

### E.    Creation of BlueBeat Website

13.    The BlueBeat website is a non-interactive service whose displays are educational, multi-media works that include history, biographies, original art, slide shows, visualizations and the sounds that accompany those works, for the purpose of informing and enlightening its users about music, culture, history and the arts.  It is

1  free to the public.  BlueBeat obtained section 112 and 114 statutory licenses as well

2  as interactive publishing licenses from ASCAP, BMI, and SESAC.  It has paid all

3  applicable royalties to copyright holders.   Attached hereto and marked as **Exhibit**

4  **G**  are BlueBeat's section 112 and 114 licenses.

5        14.     BlueBeat operates as a non-interactive service because the

6  programming on each of its 3 channels does not substantially consist of sound

7  recordings performed within 1 hour of the request or at a time set by either BlueBeat

8  or its users. The 3 channels are: Time Machine with 189 programs; killer playlists

9  with 287 programs; and Be the DJ which has 3700 programs. A BlueBeat user with

10  a valid account is granted, fair use access to listen to a particular song from

11  BlueBeat's audio visual service, to enable the user to create new audio visual

12  performances that BlueBeat may transmit to the public at large. The "DJ" can listen

13  to a song and press the little + button on the album page and the song will be added

14  to the DJ's intended performance. If the DJ changes his mind, he can undo the work

15  from his performance. He can only listen to the newly created performance when he

16  has finished his production and has informsed BlueBeat that the performance is

17  ready for transmission and display to the public at large. Once that occurs, BlueBeat

18  will display the new work on the site so the public at large can enjoy the new

19  performance. BlueBeat programs the new work to comply with the section 114

20  "sound recording performance compliment" rules which govern channel

21  transmissions.  Each channel is programmed not to perform sound recordings within

22  1 hour of the request or at a time set by BlueBeat or any user.

23        15.     Be the DJ has been in use since 2005 and BlueBeat has paid all

24  required royalties to ASCAP EMI, SESAC and SoundExchange for use of their

25  works at the statutory rate. Although BlueBeat is required to pay only one royalty to

26  a given performance rights group for the underlying composition, it paid 3 royalties

27  for each performance to ASCAP, BMI and SESAC. BlueBeat did this to ensure that

28

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

539380

CV 09 08030 JFW (JCx)

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY
INJUNCTION

1  each composer/songwriter was paid. Attached and marked as **Exhibit H** are

2  exemplar reports of triple payments for the Beatles from 2007.

3      16.    BlueBeat transmitted its audio visual works either as downloads or

4  streams, from 2004 to present. All files include anti-circumvention technological

5  measures to protect each work from copying as part of the patented SCMS.

6  Embedded on every BlueBeat transmission file is an encrypted "security thread,"

7  similar to that found in a hundred dollar bill.  Contained within the thread are

8  copyright management directions so that every device the file encounters can act in

9  accordance with the usage requirements specific to the work transmitted.

10      17.    The BlueBeat audio visual player is a device, not contained on the main

11  BlueBeat site pages, unlike Pandora or Myspace. The A/V Player allows a user

12  remote access to all of the site's works, including biographies, slide shows, artwork,

13  DJ Channels, etc. A user activates the BB player by pressing PLAY for programs on

14  the main site. The device then opens as a small separate window that can  be

15  displayed on the user's screen or dragged onto a different screen. It plays the

16  BlueBeat audio visual work and lists the program, artist of the underlying sound

17  recording or composer, title of the sound recording, and song name.  There is a

18  More Info button on the A/V player that can be clicked by the user which remotely

19  accesses the BlueBeat main site and opens the BlueBeat Album Page. This page

20  includes licensed album art, genre information, CD label, CD release date,

21  composers and contributing artists for each track.

22      18.    To acquire and display this much audiovisual  material was a costly and

23  time consuming production, but the RIAA and EMI required that such information

24  be displayed on the Album.   BlueBeat worked with RIAA, EMI, Sony, Warner

25  Brothers and Universal to create a display standard that would satisfy their needs for

26  promotion and credit for their works. Meetings began in mid 2002 for their project,

27  and I worked directly with  Carlos Garza,. Chief Technology Officer at RIAA.

28

**ROBINSON & WOOD, INC.**
ATTORNEYS AT LAW

539380

CV 09 08030 JFW (JCx)

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1    19.    RIAA , EMI , the Labels and  MRT agreed on a display standard for

2  BlueBeat so that the simulated mp3 files could be properly encoded with the meta-

3  data to display and credit the underlying works produced by BlueBeat. The royalties

4  to be paid to EMI and the other labels would be at the statutory rate charged under

5  the 114 license. To facilitate the additional encoding and production , BlueBeat

6  obtained Licenses to display photographs, album art, biographies and other materials

7  from Amazon, Barnes and Noble, Corbis and All Music Guide

8    20.    Just prior to the launch of the BlueBeat webcast service, MRT entered

9  into confidential agreements with the major record labels, including Plaintiffs,

10  permitting each record label to evaluate the BlueBeat service to determine whether

11  there was any non-licensed or infringing material on the site.  Attached as **Exhibit I**

12  is a true and correct copy of the confidential agreements.  The labels were provided

13  special password protected accounts, granting them private access to the entire site

14  prior to the public launch.  During this evaluation period, I disclosed to EMI that the

15  sound recordings to be transmitted by BlueBeat as part of audio visual displays were

16  created independently by simulation and delivered not by conventional streaming,

17  but by direct download, encrypted to permit one play only.  EMI was encouraged to

18  test the effectiveness of the SCMS incorporated into each audio visual display

19  transmission.  It did so and notified me that MRT's SCMS was 100 percent

20  effective.  EMI explicitly approved the site for public launch.  During this testing

21  and approval process, BlueBeat worked with Ted Cohen, V.P. of Digital

22  Development and Distribution, Ken Parks, Ralph Munson and Richard Cotrell, head

23  of anti-piracy at EMI.

24    21.    Following the demonstration of the SCMS on the BlueBeat prototype,

25  Mr. Richard Gooch, Chief Technical Officer of the IFPI, requested that MRT

26  modify its SCMS to accommodate the windows media audio (WMA) file format.

27  That was accomplished in early, 2006.

28

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY
INJUNCTION

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

22.     During the evaluation process of the pre-public launch of the BlueBeat site, EMI, RIAA and the Labels  approved the additional required information and art on the BlueBeat Album page with direct access to these materials from the remote BlueBeat Audio Visual Player. Ted Cohen, told me at a meeting in Los Angeles that these additional materials promoted their works and would ensure accurate royalty payments. EMI and RIAA  and the Labels wanted BlueBeat to incorporate back-end server meta-data for broadcast transmission verification for accurate royalty payments. EMI informed me that without such  back-end server information, BlueBeat might its transmitting created our independently multi-media works outside the scope of its statutory license. BlueBeat complied with the request at great  time and expense to the company and has provided and continues to provide accurate royalty reports to SoundExchange and to the music publishers since its public launch in 2004.  Attached hereto and marked as **Exhibit J**.

23.     In 2005, Plaintiffs and other labels granted BlueBeat the first experimental international webcasting license through Phonographic Performance Limited ("PPL"), the UK equivalent of Sound Exchange.  Attached hereto and marked as **Exhibit K** is the PPL license agreement.

24.     In 2006, the PPL granted a license for Be the DJ as a non-interactive service for transmission to England.  Attached as **Exhibit L** is a true and correct copy of the license and email confirming its non-interactive service.

25.     BlueBeat's website includes a disclosure on each and every page of its site (there are over a million such pages) that "BlueBeat transmits simulated live musical performances at 160 and 320 kbs."  Attached hereto and marked as **Exhibit M** is a copy of a screen shot of one such disclosure.

26.     BlueBeat obtained copyright registration for over one million audio visual works.  These works consist of slide shows, biographies, album at, etc. and the sounds related to them.  Attached hereto and marked as **Exhibit N** is a true copy of the copyright registration issued to me for said audio visual works.  BlueBeat

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

539380

10

CV 09 08030 JFW (JCx)

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1  discloses on each page of the site the following:  "All audio-visual works copyright

2  see 2009 (reg.PAu3-407-524 BlueBeat, Inc., a subsidiary of MRT."

3

4          I declare under penalty of perjury under the laws of the United States of

5  America that the foregoing is true and correct.

6          Executed on this 10th day of November, 2009 at San Jose, California.

7

8                                                   _____/s/_____

9                                                   HANK RISAN, Individually and as
                                                    Chief Executive Officer of
10                                                  BlueBeat.com, Inc.
                                                    Media Rights Technologies, Inc.
11                                                  BaseBeat.com, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ROBINSON & WOOD, INC.**
ATTORNEYS AT LAW

539380

CV 09 08030 JFW (JCx)

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY
INJUNCTION