MUTUAL NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement ("**Agreement**") is entered into as of February 19th, 2003 (the "**Effective Date**") by and among Music Public Broadcasting ("**MPB**"), the Recording Industry Association of America ("**RIAA**") and IFPI Secretariat ("**IFPI**") (hereinafter referred to individually as a party and collectively as the parties).

The parties wish to protect and preserve the confidential and/or proprietary nature of information and materials that may be disclosed or made available to each other solely for use in connection with discussing digital rights management technology (the "**Purpose**"). It is understood by the parties that each party to this Agreement may act as the disclosing party ("**Discloser**") and the receiving party ("**Recipient**") during the term of this Agreement and will be bound by the obligations on Discloser and Recipient as set out under this Agreement.

In consideration of the foregoing and the rights and obligations set forth herein, the parties hereby agree as follows:

1. PROPRIETARY INFORMATION.

"**Proprietary Information**" means any and all information and material disclosed by the Discloser to the Recipient or obtained by the Recipient through inspection or observation of Discloser's property or facilities (whether in writing, or in oral, graphic, electronic or any other form) that is marked as (or provided under circumstances reasonably indicating it is) confidential or proprietary, or if disclosed orally or in other intangible form or in any form that is not so marked, that is identified as confidential at the time of such disclosure. Proprietary Information, includes, without limitation, any (a) trade secret, know-how, idea, invention, process, technique, algorithm, program (whether in source code or object code form), hardware, device, design, schematic, drawing, formula, data, plan, strategy and forecast of, and (b) technical, engineering, manufacturing, product, marketing, servicing, financial, personnel and other information and materials of, Discloser and its employees, consultants, investors, affiliates, licensors, suppliers, vendors, customers, clients, members and other persons and entities. Additionally, the M-Streem Secure DRM Software, M-Streem $X^1$ Recording Control Software and other MPB digital rights management technology is the Proprietary Information of MPB.

2. NON-DISCLOSURE AND LIMITED USE.

Recipient shall hold all Proprietary Information in strict confidence and shall not disclose any Proprietary Information to any third party, other than to its employees who need to know such information and who are bound in writing by restrictions regarding disclosure and use of such information comparable to and no less restrictive than those set forth herein. IFPI and/or RIAA may also, upon prior consent in writing given by MPB, disclose Proprietary Information to its members. In the case of IFPI, members is understood to mean the members of IFPI, International Federation of the Phonographic Industry.

Recipient shall not use any Proprietary Information for the benefit of itself or any third party or for any purpose other than the Purpose. Recipient shall take the same degree of care that it uses to protect its own confidential and proprietary information and materials of similar nature and importance (but in no event less than reasonable care) to protect the confidentiality and avoid the unauthorized use, disclosure, publication or dissemination of the Proprietary Information. Recipient shall not make any copies of the Proprietary Information unless otherwise approved in writing in advance by Discloser. Any such copies made shall be identified as the property of Discloser and marked "confidential," "proprietary" or with a similar marking . Recipient shall not decompile, disassemble or otherwise reverse engineer any Proprietary Information or any portion thereof, or determine or attempt to determine any source code, algorithms, methods or techniques embodied in any Proprietary Information or any portion thereof. The obligations of this Section 2 with respect to any item of Proprietary Information or with respect to any discussions concerning the Purpose between the parties shall survive any termination or expiration of this Agreement.

3. SCOPE.

The obligations of this Agreement, including the restrictions on disclosure and use, shall not apply with respect to any Proprietary Information to the extent such Proprietary Information: (a) is or becomes publicly known through no act or omission of Recipient; (b) was rightfully known by Recipient before receipt from Discloser, as evidenced by Recipient's contemporaneous written records; (c) becomes rightfully known to Recipient without confidential or proprietary restriction from a source other than Discloser that does not owe a duty of confidentiality to Discloser with respect to such Proprietary Information; (d) was made known to the Recipient by the Discloser prior to the

Effective Date of this Agreement; or (e) is independently developed by Recipient without the use of or reference to the Proprietary Information of Discloser, as evidenced by Recipient's contemporaneous written records. In addition, Recipient may use or disclose Proprietary Information to the extent (i) approved by Discloser or (ii) Recipient is legally compelled to disclose such Proprietary Information, provided, however, that prior to any such compelled disclosure, Recipient shall give Discloser reasonable advance notice of any such disclosure and shall cooperate with Discloser in protecting against any such disclosure and/or obtaining a protective order narrowing the scope of such disclosure and/or use of the Proprietary Information. Further, each party may disclose the terms and conditions of this Agreement: (A) as required by the applicable securities laws, including, without limitation, requirements to file a copy of this Agreement (redacted to the extent reasonably permitted by applicable law) or to disclose information regarding the provisions hereof or performance hereunder to applicable regulatory authorities; (B) in confidence, to legal counsel; or (C) in connection with the enforcement of this Agreement or any rights hereunder.

4. **OWNERSHIP.**

All Proprietary Information of Discloser (including, without limitation, all copies, extracts and portions thereof) is and shall remain the sole property of Discloser. Recipient does not acquire (by license or otherwise, whether express or implied) any intellectual property rights or other rights under this Agreement or any disclosure hereunder, except the limited right to use such Proprietary Information in accordance with the express provisions of this Agreement. All rights relating to the Proprietary Information that are not expressly granted hereunder to Recipient are reserved and retained by Discloser.

5. **NO WARRANTY.**

Except as may be otherwise agreed to in writing, no warranties of any kind, whether express or implied, are given by Discloser with respect to any Proprietary Information or any use thereof, and the Proprietary Information is provided on an "AS IS" basis. Discloser hereby expressly disclaims all such warranties, including any implied warranties of merchantability and fitness for a particular purpose and any warranties arising out of course of performance, course of dealing or usage of trade.

6. **TERM AND TERMINATION.**

This Agreement shall come into force on the Effective Date and shall, subject to earlier termination under this Section 6, remain in force for a period of three (3) years from the Effective Date. Any party may terminate this Agreement at any time upon written notice to the other parties, and upon such notice no party shall have any obligation to disclose any Proprietary Information or to continue discussions relating to, or to enter into or continue any arrangement or agreement relating to, the Purpose or any other matter, except as agreed in writing by the parties. Sections 1, 3, 4, 5, 6, 7, 8 and 10 and, to the extent expressly provided therein, Sections 2 and 9, shall survive the expiration or termination of this Agreement.

7. **REMEDIES.**

Recipient agrees that, due to the unique nature of the Proprietary Information, the unauthorized disclosure or use of the Proprietary Information of Discloser will cause irreparable harm and significant injury to Discloser, the extent of which will be difficult to ascertain and for which there will be no adequate remedy at law. Accordingly, Recipient agrees that Discloser, in addition to any other available remedies, shall have the right to an immediate injunction and other equitable relief enjoining any breach or threatened breach of this Agreement without the necessity of posting any bond or other security. Recipient shall notify Discloser in writing immediately upon Recipient's becoming aware of any such breach or threatened breach.

8. **RETURN OF MATERIALS.**

Upon any termination of discussions or any business relationship between the parties related to the Purpose, or of this Agreement, or at any time at Discloser's request, (a) Recipient shall promptly return to Discloser or destroy all materials (in written, electronic or other form) containing or constituting Proprietary Information of Discloser, including any copies and extracts thereof, and (b) Recipient shall not use such Proprietary Information in any way for any purpose.



EXHIBIT E PG 2

9. **BUSINESS RELATIONSHIPS.**

The parties acknowledge that each party's employees and contractors are valuable business assets. The parties agree that, during the period until the Purpose is completed and for one (1) year thereafter, they shall not (for itself or for any third party) divert or attempt to divert from any other party any employee or contractor, through solicitation or otherwise.

10. **MISCELLANEOUS.**

This Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all prior or contemporaneous representations, negotiations, conditions, communications and agreements, whether oral or written, between the parties relating to the subject matter hereof and all past courses of dealing or industry custom. No amendment, modification or waiver of any provision of this Agreement shall be effective unless in writing and signed by duly authorized signatories of all the parties. The waiver by any party of a default under any provision of this Agreement shall not be construed as a waiver of any subsequent default under the same or any other provision of this Agreement, nor shall any delay or omission on the part of any party to exercise or avail itself of any right or remedy that it has or may have hereunder operate as a waiver of any right or remedy. This Agreement shall be governed by and construed in accordance with the laws of the State of California, USA, without reference to its conflicts of laws provisions. This Agreement and the rights and obligations hereunder may not be assigned or delegated by any party, in whole or part, whether voluntarily, by operation of law, change of control or otherwise, without the prior written consent of all other parties. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of each party and their respective successors and permitted assigns. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be invalid or unenforceable, the remaining portions hereof shall remain in full force and effect and such provision shall be enforced to the maximum extent possible so as to effect the intent of the parties and shall be reformed to the extent necessary to make such provision valid and enforceable. Each party to this Agreement is an independent contractor, and shall not have any authority of any kind to bind any other party in any respect whatsoever.

| MUSIC PUBLIC BROADCASTING | RECORDING INDUSTRY ASSOCIATION OF AMERICA |
|---|---|
| By: _____ (signature) | By: Barry K. Robinson (signature) |
| Name: HAWK TRISAN (print) | Name: Barry K. Robinson (print) |
| Title: CEO | Title: Senior Counsel for Corporate Affairs |

IFPI SECRETARIAT

By: _____

Name: Paul Jessop
Title: Chief Technology Officer

EXHIBIT E PG. 3

February 3, 2003  10:17 PM                                3
wla - 9902