1  RUSSELL J. FRACKMAN (SBN 49087)
   MARC E. MAYER (SBN 190969)
2  MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
3  Los Angeles, California 90064-1683
   Telephone:  (310) 312-2000
4  Facsimile:  (310) 312-3100

5  Attorneys for Plaintiffs

6

7                    UNITED STATES DISTRICT COURT

8                  CENTRAL DISTRICT OF CALIFORNIA

9

10 CAPITOL RECORDS, LLC, a Delaware      CASE NO.   2:09-cv-08030 JFW (JC)
   limited liability company; CAROLINE
11 RECORDS, INC., a New York            Honorable John F. Walter
   Corporation; EMI CHRISTIAN MUSIC
12 GROUP INC., a California Corporation; **REPLY MEMORANDUM IN**
   PRIORITY RECORDS, LLC, a            **SUPPORT OF ORDER TO SHOW**
13 Delaware limited liability company;  **CAUSE RE: PRELIMINARY**
   VIRGIN RECORDS AMERICA, INC.,        **INJUNCTION; AND**
14 a California Corporation; and NARADA
   PRODUCTIONS, INC., a Wisconsin       **REPLY DECLARATIONS OF**
15 corporation,                         **THOMAS SCHLUM, PIETRO**
                                        **PERONA, JAMES D. BERKLEY,**
16           Plaintiffs,                **MATTHEW ROTHMAN, AND**
                                        **ALASDAIR MCMULLAN**
17      v.
                                        Date:  November 20, 2009
18 BLUEBEAT, INC., a Delaware           Time: 11:00 a.m.
   corporation, doing business as       Ctrm: 16
19 www.bluebeat.com; MEDIA RIGHTS
   TECHNOLOGIES, INC., a California
20 corporation; BASEBEAT, INC., a
   Delaware corporation, doing business as
21 www.basebeat.com; and HANK RISAN,
   an individual; and DOES 1 through 10,
22
             Defendants.
23

24

25

26

27

28

REPLY MEMORANDUM AND DECLARATIONS IN SUPPORT OF ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

Introduction......................................................................................................... 1

I.    DEFENDANTS HAVE VIOLATED PLAINTIFFS'
      EXCLUSIVE RIGHTS. ................................................................... 3

      A.    Defendants Copied Plaintiffs' Sound Recordings. ............................. 3

      B.    Defendants Violate Plaintiffs' Exclusive Rights Under
            Section 114(b). ................................................................... 6

      C.    Defendants Also Have Infringed By Making
            "Intermediate" Copies Of Plaintiffs' Sound Recordings.................... 10

      D.    Section 114(d) Of The Copyright Act Does Not Permit
            Defendants To Provide Free On-Demand Streams. ........................... 11

II.   DEFENDANTS' REMAINING ARGUMENTS ARE
      IRRELEVANT........................................................................... 12

Conclusion ........................................................................................ 12

DECLARATION OF THOMAS SCHLUM .............................................. 13

DECLARATION OF PIETRO PERONA, PH.D. ..................................... 21

DECLARATION OF JAMES BERKLEY ............................................... 26

DECLARATION OF MATTHEW K. ROTHMAN .................................. 28

DECLARATION OF ALASDAIR MCMULLAN ..................................... 30

Mitchell
Silberberg &
Knupp LLP

2443597.DOC

REPLY MEMORANDUM AND DECLARATIONS IN SUPPORT OF ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Bridgeport Music, Inc. v. Dimension Films,
    410 F.3d 792 (6th Cir. 2005)...............................................................7, 8, 9

Goldstein v. California,
    412 U.S. 546 (1973)...........................................................................6, 9

Grand Upright Music Ltd. v. Warner Bros. Records, Inc.,
    780 F. Supp. 182 (S.D.N.Y. 1991)........................................................9

MAI Sys. Corp. v. Peak Computer, Inc.,
    991 F.2d 511 (9th Cir. 1993).............................................................10

Sega v. Accolade, Inc.,
    977 F.2d 1510 (9th Cir. 1993)...........................................................10

UMG Recordings, Inc. v. MP3.com, Inc.,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000).....................................................5

United States v. Taxe,
    540 F.2d 961 (9th Cir. 1976)...........................................................8, 9

United States v. Taxe,
    380 F. Supp. 1010 (C.D. Cal. 1974)..................................................8, 9

## STATUTES

Title 17 United States Code – Copyright Act
    § 112 .................................................................................2, 10, 11
    § 114 .........................................................................................*passim*
    § 115(c)(3)(G)(i)...........................................................................12

California Civil Code
    § 980(a)(2)......................................................................................9

## OTHER AUTHORITIES

H.R. Rep. No. 94-1476, 1976 U.S.C.C.A.N. 5659
    (Sept. 3, 1976)...........................................................................8, 12

Mitchell
Silberberg &
Knupp LLP

2443597.DOC

REPLY MEMORANDUM AND DECLARATIONS IN SUPPORT OF ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

## Introduction

The best evidence that Defendants have infringed Plaintiffs' exclusive rights in their sound recordings is that Defendants' recordings sound identical to (and were marketed and sold as) Plaintiffs' original recordings.[1] Defendants' Memorandum in Opposition to the Order to Show Cause ("Opp.") further confirms that Defendants have infringed Plaintiffs' copyrights and related rights (as well as the copyrights, trademarks and rights of publicity of other record companies, musical acts, and recording artists) and that a preliminary injunction is necessary and appropriate.[2]  Specifically, Defendants now concede that they:

- Purchased hundreds or thousands of Plaintiffs' sound recordings at retail "over the counter."  Declaration of Hank Risan ("Risan Decl."), ¶ 7.

- Copied (i.e., "ripped") all of these sound recordings to a computer.

- Used the copied recordings to make digital files, which sound identical to Plaintiffs' original sound recordings and that Defendants identified with the original titles, original recording artists, original cover artwork, and original release date.

- Sold, as the originals, these digital files for download (at $0.25) and offered them, again as the originals, for free on-demand streaming.  Declaration of James Berkley In Suppt. of Application for TRO ("Berkley TRO Decl."), ¶ 2-4, 9-11, 16-18 & Exs. 1-2, 7, 9, 11-12, 19-22.

Put simply, Defendants used digital technology to commit classic copyright infringement, including by copying Plaintiffs' sound recordings and then publicly performing and distributing them over the Internet.  Unable to refute these basic

---

[1]  Attached to the Declaration of Thomas Schlum (as Exhibit 1) is a CD-Rom containing Plaintiffs' original and Defendants' copies of three popular recordings.

[2] Defendants' only argument concerning irreparable harm is their brief, unsupported statement in Opposition to the Application for a Temporary Restraining Order that the harm to Plaintiffs was compensable by monetary damages.  The Court rejected that argument.  See Nov. 5 Order at 5-6.

1   facts, Defendants deliberately obfuscate them, relying on technobabble and

2   doublespeak rather than evidence or legal authority.  Indeed, Defendants do not

3   address any of the cases cited by Plaintiffs or by the Court in its November 5

4   Order.  Nor do they provide competent evidence to support their claim that the

5   media files they provided are "new" sound recordings.  However, one thing is clear

6   -- Defendants used commercial CDs of Plaintiffs' sound recordings to create

7   "perfect fidelity" reproductions, and even their so-called "psychoacoustic"

8   recording technique required and was based on sounds extracted from Plaintiffs'

9   CDs.

10        The lack of evidence that Defendants did anything other than duplicate

11   Plaintiffs' sound recordings alone is sufficient to issue the requested Injunction.  If

12   there were any remaining doubt, it is put to rest by the testimony of Plaintiffs' head

13   of technology, who confirmed that the digital files being distributed and publicly

14   performed by Defendants are copies of Plaintiff's recordings, with only minor

15   technical variations consistent with the process by which recordings are

16   compressed into (i.e., copied into) digital MP3 files.  Declaration of Thomas

17   Schlum ("Schlum Decl."), ¶¶ 6-8.  That conclusion is bolstered by Defendants'

18   own admissions, including that the digital files offered for sale on the BlueBeat

19   Website at all times have been advertised and sold as embodying the original

20   sound recording (in "perfect fidelity") ("Berkley TRO Decl.", Ex. 23).

21        Defendants' attempt to hide behind Sections 114 and 112 of the Copyright

22   Act, which are completely inapplicable to their conduct, only confirms their

23   infringement.  A plain reading of Section 114(b), bolstered by its legislative history

24   and the caselaw, confirms that it is intended to address "cover" recordings by new

25   artists, and does not protect entities such as Defendants from liability for using

26   computer technology to make digital copies of sound recordings.  Equally

27   problematic is Defendants' false claim that they obtained licenses that permitted

28

Mitchell
Silberberg &
Knupp LLP

2443597.DOC

REPLY MEMORANDUM AND DECLARATIONS IN SUPPORT OF ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

1   copying and public performance of Plaintiffs' sound recordings in furtherance of a

2   "non-interactive" webcast.  Leaving aside the obvious contradiction inherent in this

3   claim (namely, that Defendants purported to obtain licenses for recordings which

4   they claim to own), it is frivolous.  Defendants are ***selling*** Plaintiffs' recordings for

5   digital download and are publicly performing them ***on demand***.  This is the very

6   definition of an "interactive" service that does not qualify for license under Section

7   114.  Thus, even if Defendants had obtained (and properly paid for) these licenses

8   (of which the evidence is scattered and incomplete), they cannot insulate

9   Defendants from liability.

10          Finally, Defendants' attempt to inject irrelevant material that has no bearing

11   on the issue before the Court simply emphasizes that they have no defense.

12   **I.     DEFENDANTS HAVE VIOLATED PLAINTIFFS' EXCLUSIVE**
13   **        RIGHTS.**

14          **A.     Defendants Copied Plaintiffs' Sound Recordings.**

15          Defendants devote most of their Opposition to a confusing discussion of

16   "psychoacoustic simulation." (Risan Decl., ¶ 7).  Defendants recite that because

17   they used a complex technological process (involving "parametric models" and

18   "computer-staged environments") to create digital files from Plaintiffs' recordings,

19   they are "new" recordings and do not infringe.  This smoke-and-mirrors is

20   designed to obfuscate the fact that that the works Defendants sold, distributed, and

21   publicly performed were taken from and appropriated Plaintiffs' works.

22          As a threshold matter, Risan's declaration should be accorded little, if any,

23   probative weight, because it lacks foundation and completely omits ***any*** details or

24   evidence about the "technological processes."  (See Evidentiary Objections, filed

25   concurrently herewith).  Instead, the declaration is comprised of meaningless and

26   confusing jargon, which is not defined or explained.  For example, Risan does not

27   explain (and certainly not in any comprehensible fashion) how the sounds

28

Mitchell
Silberberg &
Knupp LLP

2443597.DOC

3

REPLY MEMORANDUM AND DECLARATIONS IN SUPPORT OF ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

1   contained in his digital files were created (other than that unidentified operators

2   "synthesized an [undefined] independent parametric model"), how his "new"

3   digital recordings differ in *any* meaningful respect from the original recording

4   (other than that they contain "new capture points" and "new source points"), or

5   what his "virtual 3-D staging environment" is.  See, e.g., Risan Decl., ¶ 7.  These

6   omissions (likely intentional) render Risan's declaration incomplete, and they

7   completely foreclose any serious scientific evaluation of his claims.  See

8   Declaration of Pietro Perona ("Perona Decl."), ¶ 4.  Moreover, Risan's entire

9   technological discussion is without foundation, devoid of any admissible evidence

10  (including screenshots, computer software programs, or digital media files) and

11  unsupported either by declarations of the persons (so called "artistic operators")

12  who Risan claims participated in the process, or by any experts.

13       Notwithstanding the foregoing, Risan confirms that regardless of the precise

14  technical means used, Defendants' infringing works were entirely premised on

15  (and wholly dependent upon) Plaintiffs' sound recordings.  See Perona Decl., ¶ 7.

16  Risan admits that he was required to copy "over the counter" copies of Plaintiffs'

17  sound recordings to create his "new" recordings.  He admits that his "independent

18  parametric model" used (and was based on) the sounds he extracted from

19  Plaintiffs' commercial recordings, either in their entirety or in "segments."  Risan

20  Decl., ¶ 7 ("artistic operators" "synthesized an independent parametric model of

21  *the sounds* [captured from commercial recordings]") (emphasis added).  Risan's

22  jargon about "capture points" and "source points" is equivalent to saying that

23  Defendants "recaptured" in a digital file the very same content (either in its entirety

24  or in segments) that they copied from the compact discs that they bought.  Perona

25  Decl., ¶ 7.  This is *necessarily* the case, because Defendants never hired musicians

26  or artists to perform new versions of the works, yet created tens of thousands of

27  albums (in "perfect fidelity") substantively indistinguishable from the originals.

Mitchell
Silberberg &
Knupp LLP
2443597.DOC

28

4

REPLY MEMORANDUM AND DECLARATIONS IN SUPPORT OF ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

1    In any event, the Court need not dissect or evaluate Risan's opaque

2    declaration, because there is no genuine dispute – and expert review of

3    Defendants' sound files confirms – that Defendants' files are made from and are

4    copies of the original performances embodied in Plaintiffs' recordings. See

5    Schlum Decl, ¶¶ 6-8. To the extent there are any differences between Defendants'

6    digital files and Plaintiffs' original recordings, they are purely technical differences

7    that are consistent with the process by which the files contained on CDs are

8    compressed into MP3 files.[3]  Id., ¶ 7. See UMG Recordings, Inc. v. MP3.com,

9    Inc., 92 F. Supp. 2d 349, 350 n.1 (S.D.N.Y. 2000) ("[D]efendant claims that the

10   simulated sounds on MP3-based music files are not physically identical to the

11   sounds on the original CD recordings... Defendant concedes, however, that the

12   human ear cannot detect a difference between the two.... In such circumstances,

13   some slight, humanly undetectable difference between the original and the copy

14   does not qualify for exclusion from the coverage of the [Copyright] Act.").

15   The foregoing is confirmed by aural comparison of Plaintiffs' sound

16   recordings and Defendants' copies (see Schlum Decl., Ex. 1), and is consistent

17   with Defendants' repeated admissions (prior to the litigation) that the works they

18   are selling and performing are ***Plaintiffs' sound recordings***:

19   •    The recordings sold and streamed by Defendants were labeled and

20   promoted as ***Plaintiff's sound recordings***, and used Plaintiffs' names, the names of

21   the original recording artists, and (again without authority) cover artwork from

22   Plaintiffs' albums. See Berkley TRO Decl., ¶¶ 16-18, Exs. 19-22; Risan Decl., Ex.

23   H. Indeed, all recordings made available on the BlueBeat Website were displayed

24   – both on the BlueBeat Website ***and*** on the user's computer ***after being***

25

26   [3] Defendants claim that the binary code – or, more accurately, two one-second
snippets of binary code -- (i.e. the ones and zeros that comprise the digital files) is

27   not identical. This is a red herring. Any time that sounds are copied, including by
being transferred from one medium to another, there will be substantial differences
in the binary code. Perona Decl., ¶ 8.

28

Mitchell
Silberberg &
Knupp LLP
2443597.DOC

5

1    *downloaded* – with the same album title, the same tracks (in the same order), and

2    the same release date as Plaintiffs' albums. <u>E.g.</u>, Berkley TRO Decl., Exs. 5, 19-

3    20 (screenshots from BlueBeat Website) & 16-17 (screenshots of downloaded

4    tracks). <u>See also</u> <u>Goldstein v. California</u>, 412 U.S. 546, 549 (1973) (pirated

5    recordings contained "the same title as had appeared on the original recording, and

6    the name of the performing artists").

7        •   Defendants purport to have sought and obtained webcasting licenses

8    for the digital public performance of ***Plaintiffs' sound recordings***, and purport

9    (contrary to the available evidence) to have complied with the statutory

10   requirements for such performances. <u>See</u> Risan Decl., Ex. H.

11       •   The BlueBeat Website advertises that the quality and nature of

12   recordings offered by Defendants is comparable to legitimate copies of the same

13   titles offered via online retailers such as Amazon.com, and touts the fact that its

14   versions are cheaper. Berkley TRO Decl., Ex. 8.

15       •   Defendants' website promised that "all appropriate royalties are paid

16   to the rights holders and artists responsible for your favorite tunes," claiming that

17   this music offered users "perfect fidelity" and could be purchased by clicking " the

18   'buy' link next to any song, album or program." Berkley TRO Decl., Ex. 23.

19       **B.**   <u>**Defendants Violate Plaintiffs' Exclusive Rights Under Section**</u>

20              <u>**114(b).**</u>

21       Regardless of whether Defendants simply "ripped" commercial CDs into

22   digital files or engaged in a process of manipulation, dissection and recapture, they

23   are violating Plaintiffs' exclusive rights. 17 U.S.C. § 114(b) provides:

24       "The exclusive right of the owner of copyright in a sound recording
         under clause (1) of section 106 [the reproduction right] is limited to

25       the right to duplicate the sound recording in the form of
         phonorecords or copies that ***directly or indirectly recapture the***

26       ***actual sounds*** fixed in the recording. The exclusive right of the

27       owner of copyright in a sound recording under clause (2) of section
         106 [the adaptation right] is limited to the right to prepare a

28

      6

REPLY MEMORANDUM AND DECLARATIONS IN SUPPORT OF ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

derivative work in which the actual sounds fixed in the sound recording are *rearranged, remixed, or otherwise altered in sequence or quality*." (emphasis added).

Because, as set forth above, the digital files that Defendants made, distributed, and publicly performed are copies (either exact or nearly exact) of Plaintiffs' sound recordings, Defendants have "directly," or at a minimum, "indirectly," captured the "actual sounds" contained in Plaintiffs' sound recordings, violating Plaintiffs' reproduction right. Moreover, even if, as Defendants claim, they had modified the recordings (which apparently is not the case, see Schlum Decl., ¶ 6), that would, at most, constitute the type of alteration "in sequence or quality" that Congress expressly reserved to the copyright owner as part of its adaptation right.

The only exception to the sound recording owner's exclusive reproduction and adaptation rights is "the making or duplication of another sound recording that "consists *entirely* of an *independent fixation* of *other sounds*, even though such sounds imitate or simulate those in the copyrighted sound recording." (emphasis added). It is well-established that the "independent fixation" clause is intended to apply only to a recording of a completely *different performance* or by a *different performer* (for example, a "cover" version), even if that new performance set out to imitate the original:

> "Subsection (b) of section 114 makes clear that statutory protection for sound recordings… would not prevent a separate recording of *another performance* in which those sounds are imitated…. Mere imitation of a recorded performance would not constitute a copyright infringement even where *one performer* deliberately sets out to simulate *another's performance* as exactly as possible." (emphasis added). H.R. Rep. No. 94-1476, 1976 U.S.C.C.A.N. 5659, 5721 (Sept. 3, 1976)

See Bridgeport Music, Inc. v. Dimension Films, 410 F.3d 792, 800 (6th Cir. 2005) ("The balance that was struck [by Congress] was to give sound recording copyright

Mitchell
Silberberg &
Knupp LLP
2443597.DOC

1   holders the exclusive right 'to duplicate the sound recording in the form of

2   phonorecords or copies that directly or indirectly recapture the actual sounds fixed

3   in the recording.'… This means that the world at large is free to imitate or

4   simulate the creative work fixed in the recording so long as an actual copy of the

5   sound recording itself is not made."). In other words, the "simulations"

6   contemplated by the statute are created by investing time, money, and effort into

7   new performers and performances, not by computers recapturing the original sound

8   recording in a "virtual soundstage" (with the original performers and

9   performances). See United States v. Taxe, 380 F. Supp. 1010, 1014 (C.D. Cal.

10  1974) ("If the work is produced by imitation or simulation *by the hiring of other*

11  *musicians*, or even the same musicians, to perform the copyrighted work in as

12  similar a manner as possible, there is no infringement…. The dividing line, as I

13  read the statute, is between the re-recorder (even with changes) and the imitator or

14  simulator *who stages his own independent production*.") (emphasis added); aff'd

15  in relevant part, 540 F.2d 961 (9th Cir. 1976).

16      Further, a "new" sound recording qualifies for the exception of Section

17  114(b) only if it is comprised "*entirely*" of an independent fixation of "*other*

18  *sounds*." This requirement was intentional and meaningful. Dimension Films,

19  410 F.3d at 800-801 ("The significance of this provision is amplified by the fact

20  that the Copyright Act of 1976 added the word 'entirely' to this language…. a

21  sound recording owner has the exclusive right to 'sample' his own recording.").

22  Thus, Section 114(b) does not permit Defendants to make and sell copies of

23  Plaintiffs' sound recordings, even if (as Defendants claim) they did so by breaking

24  up the original sound recordings into constituent elements and then re-fixing them

25  in a manner substantively indistinguishable from the original. Indeed, if

26  Defendants' recordings contained (or "sample") *any* portion of Plaintiffs' sound

27  recordings (which they plainly do, see Perona Decl., ¶ 7), they are infringing.

28

Mitchell
Silberberg &
Knupp LLP

2443597.DOC

8

REPLY MEMORANDUM AND DECLARATIONS IN SUPPORT OF ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

1   Dimension Films, 410 F.3d at 800 ("If you cannot pirate the whole sound

2   recording, can you "lift" or "sample" something less than the whole? Our answer

3   to that question is in the negative"). See also, e.g., Grand Upright Music Ltd. v.

4   Warner Bros. Records, Inc., 780 F. Supp. 182 (S.D.N.Y. 1991) (digital sampling is

5   stealing).

6       Defendants' conduct is substantively no different from that (in the analog

7   era) of defendants in Taxe, 380 F. Supp. 1010. There, the defendants used

8   "specially adapted electronic tape equipment" to re-record sound recordings. Like

9   Defendants, the defendants in Taxe claimed they changed the original recordings

10  by "speeding up the sounds, slowing down the sounds, deleting certain frequencies

11  or tones or adding echoes or sounds from a moog synthesizer." Id. at 1013. Just as

12  here, the Taxe defendants promoted their recordings as "***Custom simulated*** by

13  [defendants'] singers and musicians." Taxe, 540 F.2d at 964 (emphasis added).

14  The Court rejected the claim that by using this technique they "independently

15  fixed" a new sound recording. The Ninth Circuit agreed. Id. at 965 n.2 ("The

16  copyright owner's right to reproduce the sound recording is limited to recapture of

17  the original sounds, but that right can be infringed by an unauthorized re-recording

18  which, despite changes in the sounds duplicated, results in a work of 'substantial

19  similarity'.")[4]

20      Ultimately, whether or not Defendants' altered Plaintiffs' recordings (they

21  did not) and whether or not Defendants copied Plaintiffs' recordings "entirely"

22  (they did), their conduct is infringing. Defendants' distorted reading of Section

23  114(b) would permit anyone to manufacture and sell pirated copies of sound

24

25  [4] Cal. Civ. Code § 980(a)(2) tracks the language of Section 114. Accordingly, the
    principles outlined above apply to Plaintiffs' pre-1972 Sound Recordings, and

26  Defendants' arguments fare no better under California law. See Goldstein v.
    California, 412 U.S. 546, 550 (1973) ("Petitioners are not precluded from hiring

27  their own musicians and artists and recording an exact imitation of the
    performance embodied on the master recording.")

Mitchell
Silberberg &   28
Knupp LLP
2443597.DOC

9

1  recordings by using a computer to tweak and generate these copies, and then claim

2  immunity because they are computerized "simulations."  The result would be to

3  turn Section 114(b)'s intended purpose of providing copyright protection for sound

4  recordings into a recipe to eviscerate those very protections.

**C.   Defendants Also Have Infringed By Making "Intermediate"
        Copies Of Plaintiffs' Sound Recordings.**

7        In addition to the foregoing, Defendants have now confirmed that in order to

8  make their infringing copies, they necessarily first duplicated Plaintiffs' sound

9  recordings onto their computers – a copy they incorrectly label as "ephemeral."

10  Risan Decl., ¶ 7.  That copy alone constitutes infringement, regardless of the

11  ultimate use to which it might be put.  See MAI Sys. Corp. v. Peak Computer, Inc.,

12  991 F.2d 511, 519 (9th Cir. 1993) ("[T]he loading of software into a computer

13  constitutes the creation of a copy under the Copyright Act."); Sega Enters. v.

14  Accolade, Inc., 977 F.2d 1510, 1518-19 (9th Cir. 1992) ("[T]he Copyright Act

15  does not distinguish between unauthorized copies of a copyrighted work on the

16  basis of what stage of the alleged infringer's work the unauthorized copies

17  represent").

18        Defendants know that making this "intermediate" copy is infringing.  That is

19  why they attempt to justify this initial (and separate) act of infringement as

20  permitted under Section 112 of the Copyright Act.  But in order to do so

21  Defendants intentionally mis-cite and misread that section.  The "ephemeral

22  recording" provision of Section 112 is a very limited exception to the exclusive

23  rights of copyright holders.  It only permits "transmitting organizations" to make a

24  single, temporary "ephemeral" copy of a "particular transmission program," if the

25  copy is "used *solely* for the transmitting organization's own transmissions within

26  its local service area" (17 U.S.C. § 112(a)(1) (emphasis added)) or for

27  "transmissions originating in the United States under a statutory license in

28  accordance with Section 114(f)" (17 U.S.C. § 112(e)(1)).  Section 112 does ***not***

Mitchell
Silberberg &
Knupp LLP

2443597.DOC

10

1    permit Defendants to copy sound recordings for the purpose of creating (by

2    "simulation" or otherwise) additional digital files for sale or on-demand streaming.

3         Defendants' Opposition not only fails to offer any support for its Section

4    112 theory, but in order to make this argument Defendants misleadingly omit the

5    critical (and clearly disqualifying) limitation of the "ephemeral recording" statute –

6    namely, Section 112(a)(1)***(B)***, which requires that the copy be "used solely for the

7    transmitting organization's own transmissions within its local service area."

8    Defendants cite only the ***other*** two subsections of the statute (Section 112(a)(1)***(A)***

9    and ***(C)***).  Opp. at 7.  See H.R. Rep. No. 94-1476 ("***Three*** specific limitations on

10    the scope of the ephemeral recording privilege are set out in subsection (a), and

11    ***unless all are met*** the making of an 'ephemeral recording' becomes fully

12    actionable as an infringement.") (emphasis added).  Lastly, Defendants do not

13    argue that Section 112 applies to pre-1972 recordings.

14        **D.**   **Section 114(d) Of The Copyright Act Does Not Permit Defendants**
15            **To Provide Free On-Demand Streams.**

16         Defendants apparently argue that statutory licenses they claim to have

17    obtained pursuant to Section 114 of the Copyright Act entitle them to publicly

18    perform Plaintiffs' sound recordings via an on-demand, streaming transmission.

19    This contention is wrong.  Section 114 permits statutory licenses only for ***non-***

20    ***interactive*** "webcasting" services.  See 17 U.S.C. § 114(d)(2)(A)(i).  A qualifying

21    website must comply with detailed requirements that limit the manner and

22    frequency in which a sound recording can be performed (see 17 U.S.C. §

23    114(d)(2)(C)).  By contrast, the on-demand streaming offered by Defendants is

24    "***interactive***," since a user may commence an immediate audio stream of any entire

25    album the user selects, in any order and as often as he or she chooses, see Berkley

26    TRO Decl., ¶ 18 & Ex. 22); see 17 U.S.C. § 114(j)(7) ("interactive service"

27    "enables a member of the public to receive a transmission of a program specially

28    created for the recipient or, ***on request, a transmission of a particular sound***

Mitchell
Silberberg &
Knupp LLP

2443597.DOC

11

REPLY MEMORANDUM AND DECLARATIONS IN SUPPORT OF ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

1    *recording*... selected by or on behalf of the recipient.") (emphasis added).[5]

2    **II.    DEFENDANTS' REMAINING ARGUMENTS ARE IRRELEVANT.**

3         The remainder of Defendants' papers (more than half of Risan's declaration)

4    discusses (1) Defendants' "Secure X1" digital rights management technology, (2)

5    unrelated functions of the BlueBeat Website ("Time Machine," "Killer Playlist,"

6    and "Be The DJ") not at issue, and (3) communications (and "nondisclosure

7    agreements") from before Defendants' current infringing conduct.

8         This entire confusing discussion, and all of the material relating to it, is

9    irrelevant, particularly as the conduct at issue – the distribution and on-demand

10    public performance of Plaintiffs' sound recordings – apparently began during the

11    week of October 27, 2009. McMullan Reply Decl., ¶ 4. In fact, Defendants

12    characterized this service as "Beta" (i.e., a test). <u>See</u> Berkley TRO Decl., Ex. 2.

13    Accordingly, whether anyone engaged in discussions with Defendants years ago,

14    concerning *other* functions of the BlueBeat Website, or concerning the

15    "effectiveness" of Defendants' digital rights technology, has no bearing on this

16    lawsuit (and in any event, Defendants' report of these purported discussions lacks

17    foundation). Likewise, Defendants do not even attempt to explain how a non-

18    disclosure agreement from *2003* could be relevant to providing downloads and free

19    interactive streams six years later. All that is relevant is that Plaintiffs never

20    authorized the conduct at issue. McMullan Reply Decl., ¶¶ 4, 5.

21                              <u>Conclusion</u>

22         Plaintiffs respectfully request that the Preliminary Injunction be issued.

23    DATED: November 13, 2009          MITCHELL SILBERBERG & KNUPP LLP

24                                      By:    /s/Marc E. Mayer

25

26    [5] In any event, a webcasting license would, at most, permit Defendants to perform
      (i.e., "stream") sound recordings. It would not permit them to reproduce or
27    distribute copies. <u>See</u> 17 U.S.C. § 115(c)(3)(G)(i) ("A digital phonorecord
      delivery of a sound recording is actionable as an act of infringement...").

Mitchell
Silberberg &
Knupp LLP          28
2443597.DOC
                                         12
REPLY MEMORANDUM AND DECLARATIONS IN SUPPORT OF ORDER TO SHOW CAUSE RE:
                        PRELIMINARY INJUNCTION

# SCHLUM
# REPLY DECLARATION

# DECLARATION OF THOMAS SCHLUM

I, THOMAS SCHLUM, the undersigned, declare:

1.    I am employed as Director, Head of Technology at Capitol Studios and Mastering, which is affiliated with, and performs services for, Capitol Records, LLC, Caroline Records, Inc., EMI Christian Music Group Inc., Priority Records, LLC, Virgin Records America, Inc., and Narada Productions, Inc. (collectively the "EMI Record Companies" or "Plaintiffs").   I have been asked to analyze certain sound recording files that were downloaded using the BlueBeat.com and BaseBeat.com websites.  I make this declaration in support of Plaintiffs' Reply Memorandum in support of a preliminary injunction.   I have personal knowledge of all the following facts and, if called as a witness, could and would testify competently thereto.

2.    My career involves 45 years of experience in the design and specification of systems for the recording of music, including two and a half years at Capitol Studios and, prior to that, seven years at Air Studios in London.   I have been a member of the Audio Engineering Society (the "AES") for more than 20 years.  I am thoroughly familiar with all aspects of the engineering of master sound recordings and the use of master sound recordings to produce legitimate and authorized copies, including in digital formats such as compact discs, that are distributed to the public by record companies.  I also have knowledge of the processes and quality standards employed by the major record companies in connection with the manufacture and distribution of legitimate and authorized copies of their master recordings, including authorized and legitimate phonorecords of such recordings.  In addition, I have a developed understanding of file compression technologies, including MPEG-1 Audio Layer 3 (commonly

Mitchell
Silberberg &
Knupp LLP
2446610.1

13

DECLARATION OF THOMAS SCHLUM

1   referred to as "mp3" files), and the use of digital workstations and software to

2   analyze musical recordings and/or files.

3

4      3.    When comparing the authenticity and origins of similar-sounding

5   works, audio engineers employ a process known in the industry as "A:B

6   Comparison Testing." This process is used to determine whether two sound

7   recordings that sound alike were created from the same master recording and,

8   indeed, were the same performance (i.e., whether Recording A is a copy of the

9   same master used in creating Recording B). For works that are similar in nature

10  and content, audio engineers typically rely on the human ear for direct aural

11  comparisons, a process sometimes called "A:B Switching." Here, an engineer

12  plays portions of Recording A followed by the respective portions of Recording B

13  and gauges the similarities between elements of the recordings, such as: the sound

14  of the lead vocals; the timbre and inflections of the vocals in general; the

15  complement and nuances of the instruments; the musical arrangements; the tempo;

16  the instrumentation; and, the overall mix and quality of the compared recordings.

17

18     4.    Engineers sometimes use other techniques to analyze the sounds

19  embodied in two recordings. One such engineering technique employed for audio

20  comparisons is known as "nulling," which involves loading both recordings onto a

21  digital workstation, reversing the phase of the "B" recording (i.e., changing the

22  waveform peaks of this recording to valleys and the valleys to peaks), and then

23  analyzing the result when the "A" recording and phase-reversed "B" recording are

24  aligned and added together. If the two recordings are derived from the same

25  source materials (even if they sound different to some extent), the reversing of

26  phase in the second recording will cause the sounds effectively to cancel each other

27  out to a consistent degree. If the recordings are in fact independent of each other

28  (i.e., not copied from the same original recording), the same "cancelling out" effect

Mitchell
Silberberg &
Knupp LLP
2446610.1

14
DECLARATION OF THOMAS SCHLUM

1  will not occur. Instead, there may be either be no "cancelling" effect at all, or there

2  will be amounts of cancellation that fluctuate markedly from one moment in the

3  recordings to another.

4

5      5.      On or about November 9, 2009, I was furnished via e-mail with

6  electronic files in mp3 format of several recordings downloaded via the

7  BlueBeat.com and BaseBeat.com websites on behalf of Plaintiffs in this matter

8  ("the Downloads"). My understanding is that these mp3 files had been

9  downloaded by James Berkley in connection with his declaration made in support

10  of Plaintiffs' application for a Temporary Restraining Order filed on November 3,

11  2009. Specifically, the files were labeled as the "Let It Be" performed by The

12  Beatles, "Smile" performed by Lily Allen, and "Karma Police" performed by

13  Radiohead.

14

15      6.      Beginning on or about November 9, 2009, I supervised and

16  participated in  A:B Testing performed by the Mastering Department to compare

17  the Downloads with commercially available recordings containing the identified

18  sound recordings as performed by the respective artists. Attached to this

19  declaration as Exhibit 1 is a CD containing true and correct copies of digital files

20  containing, respectively, the mp3 Downloads and Plaintiffs' commercially

21  available recordings. (Plaintiffs' recordings are those provided in ".wav" format.)

22  As is customary, I and staff of the Capitol Studios Mastering Department began the

23  testing process by performing direct aural testing to gauge the similarities between

24  the works in question. In light of my professional experience, the striking

25  similarity between the Downloads and the commercially available recordings

26  obviated the need to use advanced techniques such as the "nulling" process

27  described above, as the Downloads presented multiple signs of deriving from the

28  same recorded performances despite any minor differences of sound quality, which

CAPITOL - STUDIOS    Fax 1-323-871-5058    Nov 13 2009 10:30am P002/002
'O:Tom Schlum   COMPANY:Capitol Studios

1   could be attributed to insignificant factors of compression, remixing, equalization,

2   and/or re-recording.  For example, in each A:B pair, there was no detectable

3   difference in timing or speed with respect to *any* sonic feature – instrumental,

4   rhythmic, vocal or otherwise – at any point in the recordings.

5

6       7.     I decided to also employ the "nulling" technique, which was done

7   under my supervision and direction.  The result was that for each of the three

8   recordings listed above, the amount of cancellation between the two files, and the

9   fact that this cancellation remained at a consistent level throughout the duration of

10   the recordings, supported the conclusion that each A:B pair embodied the *same*

11   recorded performance and was reproduced from the same master recordings.  In

12   fact, what remained after the "nulling" operation would be comparable to

13   situations where the exact same audio recording is digitally encoded using different

14   processes or formats (such as converting a CD into an mp3 computer file).

15

16       8.     In my professional opinion, the foregoing clearly establishes that the

17   compared Downloads embody the same recorded performance as the respective

18   sound recordings contained in the commercially released recordings.  Despite any

19   minor variations of sound quality, they are essentially duplicates or copies of the

20   original sound recordings, and have clearly been created by capturing the actual

21   sounds embodied in Plaintiffs' sound recordings.

22

23   I declare under penalty of perjury under the laws of the United States of America

24   that the foregoing is true and correct.

25

26   Executed this _13_ day of November, 2009, at Los Angeles, CA.

27

28                                _Thomas Schlum_

                                        Thomas Schlum

Mitchell
Silberberg &
Knupp LLP

2446610.1

DECLARATION OF THOMAS SCHLUM

# EXHIBIT 1
# TO
# SCHLUM
# DECLARATION

RUSSELL J. FRACKMAN (SBN 49087)
MARC E. MAYER (SBN 190969)
Mitchell Silberberg & Knupp LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
T (310) 312-2000 F (310) 312-3100

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAPITOL RECORDS, LLC, a Delaware limited liability company; CAROLINE RECORDS, INC., a New York Corporation; EMI CHRISTIAN MUSIC GROUP INC., a California Corporation; PRIORITY RECORDS, LLC, a Delaware limited liability company; VIRGIN RECORDS AMERICA, INC., a California Corporation; and NARADA PRODUCTIONS, INC., a Wisconsin corporation <br><br>PLAINTIFF(S) | CASE NUMBER:<br>CV09-08030 JFW (JC) |
| v. <br><br>BLUEBEAT, INC., a Delaware corporation, doing business as www.bluebeat.com; MEDIA RIGHTS TECHNOLOGIES, INC., a California Corporation; BASEBEAT, INC., a Delaware Corporation, doing business as www.basebeat.com; and HANK RISAN, an individual; and DOES 1 through 10 <br><br>DEFENDANT(S). | **NOTICE OF MANUAL FILING** |

PLEASE TAKE NOTICE:

The above-mentioned cause of action has been designated as an electronically filed case. In accordance

with General Order 08-02 and Local Rule 5-4 the following document(s) or item(s) will be manually filed:

**List Documents:  Exhibit 1 to Declaration of Thomas Schlum:  CD-ROM containing six audio files**

### Document Description:

☐   Administrative Record

☒   Exhibits

☐   Ex Parte Application for authorization of investigative, expert or other services pursuant to the Criminal Justice Act [see Local Civil Rule 79-5.4, Documents to be excluded, (h)]

☐   Other Amended Initial Filing

**Reason:**

☐   Under Seal

☒   Items not conducive to e-filing (i.e., videotapes, CDROM, large graphic charts)

☐   Electronic versions are not available to filer

☐   Per Court order dated _____

☐   Manual Filing required (*reason*):

| | |
|---|---|
| November 13, 2009 | /s/ Marc E. Mayer |
| Date | Attorney Name <br> Marc E. Mayer |
| | Party Represented <br> Plaintiffs |

American LegalNet, Inc.<br>www.FormsWorkflow.com

1   RUSSELL J. FRACKMAN (SBN 49087)
    MARC E. MAYER (SBN 190969)
2   MITCHELL SILBERBERG & KNUPP LLP
    11377 West Olympic Boulevard
3   Los Angeles, California 90064-1683
    Telephone: (310) 312-2000
4   Facsimile: (310) 312-3100

5   Attorneys for Plaintiffs

6

7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9

10  CAPITOL RECORDS, LLC, a Delaware       CASE NO.  2:09-cv-08030 JFW (JC)
    limited liability company; CAROLINE
11  RECORDS, INC., a New York             Honorable John F. Walter
    Corporation; EMI CHRISTIAN MUSIC
12  GROUP INC., a California Corporation;  **MANUALLY FILED EXHIBIT 1 TO**
    PRIORITY RECORDS, LLC, a              **REPLY DECLARATION OF**
13  Delaware limited liability company;   **THOMAS SCHLUM IN SUPPORT**
    VIRGIN RECORDS AMERICA, INC.,         **OF ORDER TO SHOW CAUSE RE:**
14  a California Corporation; and NARADA  **PRELIMINARY INJUNCTION**
    PRODUCTIONS, INC., a Wisconsin        **(CD-ROM CONTAINING 6 AUDIO**
15  corporation,                          **FILES)**

16              Plaintiffs,               Date:     November 20, 2009
                                          Time:     11:00 a.m.
17         v.                             Ctrm:     16

18  BLUEBEAT, INC., a Delaware
    corporation, doing business as
19  www.bluebeat.com; MEDIA RIGHTS
    TECHNOLOGIES, INC., a California
20  corporation; BASEBEAT, INC., a
    Delaware corporation, doing business as
21  www.basebeat.com; HANK RISAN, an
    individual; and DOES 1 through 10,
22
                Defendants.
23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

2447361.1

MANUALLY FILED EX. 1 TO SCHLUM REPLY DECL ISO OSC RE: PRELIMINARY INJUNCTION



**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Mitchell Silberberg & Knupp LLP, 11377 West Olympic Boulevard, Los Angeles, California 90064-1683.

On November 13, 2009, I served a copy of the foregoing document(s) described as **MANUALLY FILED EXHIBIT 1 TO REPLY DECLARATION OF THOMAS SCHLUM IN SUPPORT OF ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION (CD-ROM CONTAINING 6 AUDIO FILES)** on the interested parties in this action at their last known address as set forth below by taking the action described below:

*Attorneys for Defendants*

Archie S. Robinson, Esq.
Joshua J. Borger, Esq.
Robinson & Wood, Inc.
227 North 1st Street
San Jose, CA 95113
PH: (408) 298-7120
FX: (408) 298-0477

☐ **BY MAIL:** I placed the above-mentioned document(s) in sealed envelope(s) addressed as set forth above, and deposited each envelope in the mail at Los Angeles, California. Each envelope was mailed with postage thereon fully prepaid.

☒ **BY OVERNIGHT MAIL:** I placed the above-mentioned document(s) in sealed envelope(s) designated by the carrier, with delivery fees provided for, and addressed as set forth above, and deposited the above-described document(s) with FEDEX in the ordinary course of business, by depositing the document(s) in a facility regularly maintained by the carrier or delivering the document(s) to an authorized driver for the carrier.

☐ **BY PERSONAL DELIVERY:** I placed the above-mentioned document(s) in sealed envelope(s), and caused personal delivery by                of the document(s) listed above to the person(s) at the address(es) set forth above.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on November 13, 2009, at Los Angeles, California.

_____
Eirlys McKenzie

Mitchell
Silberberg &
Knupp LLP

2447361.1

# PERONA
# REPLY DECLARATION

# DECLARATION OF PIETRO PERONA, PH.D.

I, PIETRO PERONA, the undersigned, declare:

1.      I am the Allen E. Puckett Professor of Electrical Engineering at the California Institute of Technology (Caltech), where I am also Executive Officer of the program in Computation and Neural Systems and Chair of the Caltech Arts Committee. I have been retained as an expert witness by the plaintiffs in this action to analyze the claims of Defendant Hank Risan regarding the music files purportedly created and offered for sale by the websites Bluebeat.com and Basebeat.com, specifically as these claims are alleged in the Declaration of Hank Risan. I have personal knowledge of all the following facts and, if called as a witness, could and would testify competently thereto.

2.      For more than twenty years, my academic expertise and research have concerned understanding human perception (such as vision, olfaction, and hearing) and replicating human perception in artificial systems (such as in computers and robotics). I am an expert in perception, signal processing, and computer modeling, and in neural and biologically inspired computer systems. I have published over a hundred technical papers on these subjects, and my work has been referenced in more than five thousand scholarly publications. I hold a Ph.D. in Electrical Engineering and Computer Science from the University of California at Berkeley and have taught at the California Institute of Technology since 1991. Among other things, I was a plenary invited speaker at the First EMS-SIAM Conference "Applied Mathematics in our Changing World" (Berlin, 2001), the 16th Neural Information Processing Conference (Vancouver, 2002), and the International Conference on Modeling Estimation and Control (Venice, 2007). Outside of my academic responsibilities, I am also the co-founder of a company called Digital

1   Persona and I helped found and serve on the technical advisory board of Evolution

2   Robotics.

3

4       3.      I have been asked by Plaintiffs to analyze the procedures that Hank

5   Risan and his associated companies allege to have used in generating the music

6   files at issue in this action. In particular, I was asked to opine on (1) the

7   computational feasibility of Risan's purported method, (2) whether such a method

8   would in fact result, as Risan claims, in the creation of "new" and "independent"

9   sounds, and (3) whether evidence introduced by Mr. Risan provides support for his

10  claim of having created independent works that are merely simulations.

11

12      4.      At the outset, it bears stressing that it is difficult to assess Mr. Risan's

13  purported methods at all, because it is insufficiently clear from his declaration

14  exactly what techniques were used to create the mp3 files he claims to be

15  independent "simulations." For example, in Paragraph 7 of his Declaration (lines

16  8-10), Mr. Risan claims: "These segments [of the copied original sounds] were

17  analyzed by artistic operators who, employing principles of psychoacoustics and

18  advanced harmonic analysis, synthesized an independent parametric model of the

19  sounds." In this statement, Mr. Risan does not specify what "parameters" were

20  extracted from the original sounds, what aspects of the sounds these parameters

21  represent, and, indeed, does not specify what he means by the "sounds" which

22  formed the basis of the model. For example, a detailed parametric model of an

23  entire recording, or even of portions of the recording, could easily amount to little

24  more than what is conventionally understood as digital sampling. (Any sampling

25  of a sound requires a parametrization of the sound.) Since Mr. Risan provides

26  insufficient details about the contents of this "parametric model," or exactly what

27  sounds this model purports to represent in the first place, there is a significant hole

28  at the center of his entire explication. Furthermore, Mr. Risan's claims are vague

1    and difficult to evaluate in other ways, as he provides no details regarding what he

2    means by numerous other terms such as "new sounds," "artistic operators,"

3    "virtual three-dimensional computer-staged environment," and "adjusted by the

4    human operator."

5

6        5.    However, insofar as Mr. Risan claims to have truly "simulated" new

7    recordings using the copied recordings placed on his computer, and to have done

8    so by breaking down each original recording into its constituent vocal and

9    instrumental elements for re-synthesis in a "virtual three dimension computer-

10   staged environment," this strikes me in my professional and expert opinion as both

11   (1) extremely unlikely, and (2) in any event, hardly proof that the sounds so

12   generated would be "independent" of the original recordings owned by Plaintiffs.

13

14       6.    That Mr. Risan could completely decompose and re-synthesize

15   recordings in this manner is unlikely insofar as such a process has proven to be an

16   enormous challenge that is the subject of ongoing and widely discussed academic

17   research.  The problem of disentangling several streams of information from a

18   mixed source is often referred to as the "Cocktail Party Effect": while humans can

19   follow an individual voice at a crowded cocktail party, or pick out an individual

20   instrument or voice as heard on an album, it is exceedingly difficult to perform

21   such a task computationally by machine, especially if *all* the sound sources are to

22   be disentangled.  It is currently possible to approach this problem only by using a

23   number of microphones that exceeds the number of original sound sources.  Since

24   Mr. Risan worked from commercially released albums that were presumably (at

25   most) stereophonic, and thus would have been limited to two "microphones" of

26   sound data, Mr. Risan would have had to solve a puzzle in 2002 or 2003 that

27   continues to pose challenges for our leading researchers, universities, and

28   commercial enterprises.

1

2      7.      At the same time, it is also my professional and expert opinion that the

3   actual process used ultimately does not affect the question of whether Mr. Risan's

4   allegedly new recordings are, as he claims, "independent" of the original.

5   Regardless of the exact process he employed – and regardless of how many times

6   the words "independent," "independence," or "independently" are used in Mr.

7   Risan's declaration – Mr. Risan's own description of his method leads me to the

8   conclusion that the resulting "new" recordings are in every detail very much

9   *dependent* on the entirety of the sounds of the original recordings.  The fact that

10  they may be based on a "parametric model" of these sounds and/or manipulated

11  computationally does not change this, nor does the claim that "artistic" decisions

12  were somehow involved in the procedure.  As an analogy, one may imagine a

13  scenario in which someone decided to take digital samples or digitized excerpts of

14  sound recordings and then broadcast the sounds of these samples from multiple

15  speakers, and recaptured them from multiple microphones arranged in a specially

16  designed room (i.e., just as Mr. Risan claims to have captured "new" sounds using

17  simulated microphones in a virtual space). The resulting recordings would clearly

18  *not* be "independent" of the original sounds; rather, they would be entirely

19  dependent upon, derivative of, and indeed captured from the actual sounds of the

20  original recordings.  For the reasons discussed above, to claim the samples

21  employed a "parametric model" of the original sounds would not change this.

22

23      8.      Finally, I have been asked to opine on evidence submitted by Mr.

24  Risan that purportedly supports his claim that there is a "difference between the

25  sounds" in Plaintiffs' recordings when compared to the versions made available by

26  the BlueBeat.com and/or BaseBeat.com websites.  I note that the only evidence

27  that Mr. Risan has submitted in this regard consists of Exhibit B and C to his

28  declaration, which, he claims, reflect the binary sequences taken from one-second

11/13/2009  00:10    55

1    clips of digital files (in .wav audio format) containing Plaintiffs' remastered version of the Beatles song "Revolution" as compared to the version he terms "Bluebeat's simulation." Mr. Risan's sole argument in this regard is: "I compared the two binary expressions and observed that they were of different lengths and contained markedly different data sequences, indisputably establishing that the two contain sounds which are disparate and dissimilar from one another." However, it is fair to say that no one with the appropriate expertise in signal processing and the nature of digital sound files would reach this same conclusion, as there are many reasons why two binary files might have seemingly different sequences yet still represent the same sounds. This could be due to differences in the encoding of the files (including "ripping" the tracks of a CD into mp3 format), to an inaudible difference of waveform phase between the digitized versions, or to scenarios in which the sounds in one or both files were copied under specific conditions (for example, by capturing the original sounds played back in a real or virtual space). Moreover, Mr. Risan fails to acknowledge that due to the nature of binary numbers, bit patterns that appear entirely different in binary code may represent what are essentially the same sounds. For example the binary codes 0111111 and 1000000 look very different, but represent the adjacent numbers 63 and 64. Thus, a visual examination of the patterns shown in Exhibits B and C is of essentially no value in determining the relationship between the recordings at issue.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of November, 2009, at Cambridge, MA.

Pietro Perona, Ph.D.

# BERKLEY
# REPLY DECLARATION

## **REPLY DECLARATION OF JAMES D. BERKLEY**

I, James D. Berkley, the undersigned, declare:

1.      I am employed as Senior Research Analyst at Mitchell Silberberg & Knupp LLP, counsel for plaintiffs Capitol Records, LLC, Caroline Records, Inc., EMI Christian Music Group Inc., Priority Records, LLC, Virgin Records America, Inc., and Narada Productions, Inc. in this action.   I have personal knowledge of all of the following facts and, if called as a witness, could and would testify competently thereto.

2.      On November 9, 2009, I sent to Matthew Rothman, Manager of Legal Affairs at EMI Music North America ("EMI"), examples of mp3 files I had purchased and personally downloaded via the websites BlueBeat.com and BaseBeat.com on dates between October 30, 2009 and November 3, 2009.  These files purported to contain recordings listed on Schedule A to the Complaint in this action, and included files labeled as the following:

- "06 Let It Be.mp3" (artist name listed as The Beatles, album title listed as "Let It Be (Remastered)")
- "01 Smile.mp3" (artist name listed as Lily Allen, album title listed as "Alright, Still…")

//
//
//
//
//
//

Mitchell
Silberberg &
Knupp LLP

2446725.1

26

1    •    "06 Karma Police.mp3" (artist name listed as Radiohead, album title

2         listed as "OK Computer")

3

4    I declare under penalty of perjury under the laws of the United States of America

5    that the foregoing is true and correct.

6

7    Executed this _13th_ day of November, 2009, at Los Angeles, CA.

8

9                                    _____

10                                   James D. Berkley

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Mitchell
Silberberg &    28
Knupp LLP

2446725.1

REPLY DECLARATION OF JAMES D. BERKLEY

# ROTHMAN
# REPLY DECLARATION

# DECLARATION OF MATTHEW K. ROTHMAN

I, Matthew Rothman, the undersigned, declare:

1.     I am currently employed by EMI Music North America ("EMI") as Manager of Legal Affairs.  I have personal knowledge of all of the following facts and, if called as a witness, could and would testify competently thereto.

2.     On November 9, 2009, I received via e-mail from James D. Berkley, Senior Research Analyst at Mitchell Silberberg & Knupp LLP, examples of mp3 files he had purchased and downloaded via the websites BlueBeat.com and BaseBeat.com on dates between October 30, 2009 and November 3, 2009.  These files purported to contain recordings listed on Schedule A to the Complaint in this action, and included files labeled as the following:

- "06 Let It Be.mp3" (artist name listed as The Beatles, album title listed as "Let It Be (Remastered)")
- "01 Smile.mp3" (artist name listed as Lily Allen, album title listed as "Alright, Still…")
- "06 Karma Police.mp3" (artist name listed as Radiohead, album title listed as "OK Computer")

3.     Subsequently, on November 9, 2009, I forwarded the three above-listed files to Thomas Schlum, Head of Technology at Capitol Studios and

//
//
//
//
//

DECLARATION OF MATTHEW K. ROTHMAN

Mitchell Silberberg & Knupp LLP

2446726.1

1    Mastering, at his e-mail address.  Mr. Schlum later confirmed receipt of these files.

2

3    I declare under penalty of perjury under the laws of the United States of

4    America that the foregoing is true and correct.

5

6    Executed this 13th day of November, 2009, at New York, NY.

7

8    _____

9    Matthew K. Rothman

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MATTHEW K. ROTHMAN

# MCMULLAN
# REPLY DECLARATION

# DECLARATION OF ALASDAIR MCMULLAN

I, Alasdair J. McMullan, declare:

1.      I am currently employed by EMI Music North America ("EMI") as Executive Vice President of Legal Affairs.  I have held that position or a similar position at all times relevant to this declaration.  I have personal knowledge of the facts set forth herein and could and would testify competently thereto if called as a witness.

2.      I have reviewed the documents that were filed by the defendants in the above captioned action on November 10, 2009, including the Memorandum Of Points And Authorities In Opposition To Order To Show Cause Re Preliminary Injunction and the Declaration Of Hank Risan In Opposition To Order To show Cause Re Preliminary Injunction (the "Risan Declaration").

3.      On October 30, 2009, I became aware for the first time that numerous sound recordings owned or exclusively controlled by EMI (collectively, the "Infringing Recordings") were being sold and distributed through the Bluebeat Website.  I went to the BlueBeat Website and observed that the Bluebeat Website provided users with the ability to interactively play unlimited free "streaming" digital performances of the Infringing Recordings as well as the ability to purchase and download the Infringing Recordings at the low price of $0.25 per recording.

4.      EMI has never issued any licenses to the Bluebeat Website, or any of its affiliates, to provide interactive streaming or to copy and sell downloads with respect to any sound recordings owned or exclusively controlled by EMI.

1         5.     In 2003, EMI entered into a non-disclosure agreement with Media

2    Rights Technologies, Inc. ("MRT") solely for the purpose of investigating MRT's

3    digital rights management technology.  EMI, however, never entered into a license

4    agreement or other business arrangement with MRT with respect to this

5    technology.

6

7         I declare under penalty of perjury under the laws of the United States that

8    the foregoing is true and correct to the best of my knowledge.

9         Executed on November 13, 2009, at New York, New York.

10

11

12         Alasdair J. McMullan

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

2445606.2

31

ShortTitle