1  RUSSELL J. FRACKMAN (SBN 49087),
   rjf@msk.com
2  MARC E. MAYER (SBN 190969),
   mem@msk.com
3  EMILY F. EVITT (SBN 261491)
   efe@msk.com
4  MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
5  Los Angeles, California 90064-1683
   Telephone: (310) 312-2000
6  Facsimile: (310) 312-3100

7  Attorneys for Plaintiffs

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12 CAPITOL RECORDS, LLC, a Delaware limited liability company; CAROLINE RECORDS, INC., a New York Corporation; EMI CHRISTIAN MUSIC GROUP INC., a California Corporation; PRIORITY RECORDS, LLC, a Delaware limited liability company; VIRGIN RECORDS AMERICA, INC., a California Corporation; and NARADA PRODUCTIONS, INC., a Wisconsin corporation, | CASE NO. CV09-8030 JST (JCx) The Honorable Josephine Staton Tucker **DECLARATION OF MARC E. MAYER IN SUPPORT OF MOTION IN LIMINE NO. 1** |

                    Plaintiffs,

            v.

BLUEBEAT, INC., a Delaware
corporation, doing business as
www.bluebeat.com; MEDIA RIGHTS
TECHNOLOGIES, INC., a California
corporation; BASEBEAT, INC., a
Delaware corporation, doing business as
www.basebeat.com; and HANK RISAN,
an individual; and DOES 1 through 20,

                    Defendants.

Mitchell
Silberberg &
Knupp LLP

3399549.1

# DECLARATION OF MARC E. MAYER

I, Marc E. Mayer, declare as follows:

1.      I am an attorney at law, duly licensed to practice law in the State of California.  I am, through my professional corporation, a partner in the law firm Mitchell Silberberg & Knupp LLP, counsel for Plaintiffs in the above-entitled action.  I know all of the following of my own personal knowledge and, if called as a witness, could and would competently testify thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of the November 11, 2009, declaration of Hank Risan, which was filed by Defendants in opposition to the Court's November 2009 Order to Show Cause re Preliminary Injunction.

3.      Attached hereto as Exhibit B is a true and correct copy of two press releases that purport to have been issued by "Hank Risan, CEO of Media Rights Technologies, Inc."  I obtained these press releases via links contained on Defendants' website, www.mediarightstech.com/press/  I printed these press releases from the Internet on December 27, 2010.

4.      Attached hereto as Exhibit C is a true and correct copy of the Declaration of Alasdair McMullan, which was filed by Plaintiffs in this action on

1  September 3, 2010.

2

3      I declare under penalty of perjury under the laws of the United States of

4  America that the foregoing is true and correct.

5

6      Executed on this 27th day of December, 2010, at Los Angeles, California

7

8

9

10      Marc E. Mayer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXHIBIT A

ARCHIE S. ROBINSON [SBN. 34789]
  asr@robinsonwood.com
JOSHUA J. BORGER [SBN. 231951]
  jjb@robinsonwood.com
ROBINSON & WOOD, INC.
227 N 1st Street
San Jose, California  95113
Telephone: (408) 298-7120
Facsimile:  (408) 298-0477

Attorneys for Defendants
**BLUEBEAT, INC., MEDIA RIGHTS
TECHNOLOGIES, INC., BASEBEAT,
INC. and HANK RISAN**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CAPITOL RECORDS, LLC, a Delaware limited liability company; CAROLINE RECORDS, INC., a New York Corporation; EMI CHRISTIAN MUSIC GROUP, INC., a California Corporation, PRIORITY RECORDS, LLC, a Delaware limited liability company; VIRGIN RECORDS AMERICA, INC., a California Corporation; and NARADA PRODUCTIONS, INC., a Wisconsin corporation,<br><br>                Plaintiffs,<br><br>vs.<br><br>BLUEBEAT, INC., a Delaware corporation, doing business as www.bluebeat.com, MEDIA RIGHTS TECHNOLOGIES, INC., a California corporation; BASEBEAT, INC., a Delaware corporation, doing business as www.basebeat.com and HANK RISAN, an individual; and Does 1 through 10,<br><br>                Defendant. | Case No. CV 09 08030 JFW (JCx)<br><br>**DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Date:     November 20, 2009<br>Time:    11:00 a.m.<br>Dept.:   16<br>Judge:  Hon. John F. Walter<br>Dept.:   16 |

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

539380

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

EX A PG 3

Case 2:09-cv-08030-JFW-JC   Document 16   Filed 11/10/2009   Page 2 of 11

1    I, Hank Risan, have personal knowledge of the facts set forth in this

2  declaration and, if called as a witness, could and would testify competently thereto. I

3  declare under penalty of perjury that the following is true and correct to the best of

4  my knowledge.

5    **A.    Background**

6    1.    I am the Chief Executive Officer for the Museum of Musical

7  Instruments ("MoMI"), incorporated in California in 2000.  I am also the Chief

8  Executive Officer for Media Rights Technologies, Inc. ("MRT"), incorporated in

9  California in 2001,  for BlueBeat.com, Inc., incorporated in Delaware in 2002, and

10  for baseBeat.com, Inc., incorporated in California in 2007.

11    2.    I hold two bachelor of science degrees from the University of

12  California in Biology and Mathematics with honors.

13    3.    I began work on psychoacoustic simulation modeling while pursuing

14  joint Ph.D. programs in Mathematics and Neurobiology at the University of

15  California, Berkeley.  I conducted super computer generated scientific simulation

16  modeling of the central nervous system and vertebrates, including aural and visual

17  perception, and transduction (i.e., conversion of sonic waves into electro-chemical

18  nerve impulses) and transmission of nerve impulses.  I conducted synthetic

19  simulation modeling of topology (or physical form) of the human hemoglobin

20  protein, based on its linear DNA sequencing.  Subsequently, at Cambridge

21  University, England, I developed methods and systems by which waveforms of

22  sound could be analyzed and synthesized by use of spherical harmonic models to

23  simulate virtual physical sources of sound, with particular emphasis on generative

24  waveform production of voice and musical instruments in artificial environments.

25    **B.    Statutory Licenses**

26

27

28

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

539380

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

EX A PG 4

Case 2:09-cv-08030-JFW-JC   Document 16   Filed 11/10/2009   Page 3 of 11

4.     In 2002, MoMI obtained section 112[1] and section 114 statutory licenses from the Copyright Office to create ephemeral copies of sound recordings for the purpose of broadcasting on the internet.  Attached hereto and marked as **Exhibit A** is a true and correct copy of MoMI's section 112 and 114 statutory licenses.

1.     Interactive publishing licenses from ASCAP, BMI and SEAC were also obtained for the purpose of paying royalties to composers for the performance of audio visual work displayed on the MoMI site.  The MoMI site is a multimedia educational site that transmits audiovisual displays to the public, featuring history of the guitar and music, primarily in the twentieth century.

**C.     Psychoacoustic Simulation**

6.     After obtaining the statutory licenses, I began experimenting with methods of creating synthetic simulations of sound recordings from the single ephemeral copy permitted under section 112.  Because the digitization process used by most record labels in creating their CD's was of inferior quality, the recorded performances were frequently masked and distorted.  This explains why the Beatles Catalog, as sold on CD, has been "re-mastered" at least three times over the past twenty years, with only moderate sonic improvement from the first catalog release.

7.     From my study of psychoacoustics, I learned that musical tones produced by musical instruments or voice consist of a sequence of time-dependent, pressurized spherical waves that originate from a source point and propagate through the air to the human ear.  When received by the ear, these sound waves are converted into electrical action potentials for the brain to process.  As result of the brain's processing, the sounds of a recording are perceived to have certain artistic

---

[1] 17 U.S.C. section 112.  Hereafter all statutory references shall be to Title 17 of the U.S. Code.

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

539380

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

EX A PG 5

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

1   characteristics.  The five most important of these parameters are pitch[2], loudness[3],

2   rhythm[4], timbre[5], and space[6].

3       Every musical sound in a sound recording has a point of origin, called a

4   source point, as well as a capture point, where the sound is affixed.  To create "pure

5   sound" simulations, I purchased CD's of sound recordings over the counter.  I made

6   one ephermal copy of each recording, as authorized by section 112, destroying same

7   shortly after the simulations were created.  The original sounds were partitioned into

8   segments for observation.  These segments were analyzed by artistic operators who,

9   employing principles of psychoacoustics and advanced harmonic analysis,

10  synthesized an independent parametric model of the sounds.  A firewall was utilized

11  to preserve independence between the sounds of the model and those of the original

12  recording.  I destroyed the ephemeral recording.

13      Positing assumptions as to the location of the microphone and spacial

14  relationship to the voice and instruments involved in a given recorded performance,

15  the artistic operator then generated and fixed **new** sounds by selecting **new** capture

16  points and **new** source points in a **new** virtual three dimensional computer-staged

17  environment.  The simulation, thus created, contained new and original spherical

18  source point waves.

19

20  [2] "Pitch" is perhaps the most significant information in music.  This complex
21  parameter is responsible for communicating the artistic message of a musical work.
    Its components consist of the melodic lines of the work, its chords, its register, and
22  its range, and in short, its overall tonal organization.  The physical dimension of
23  pitch is expressed in terms of "frequency."

24      [3] "Loudness" is the amplitude of the sound.

25      [4] "Rhythm" is the length of time the sound is perceived.

26      [5] "Timbre" is the brain's perception of the overall quality of the sound.

27      [6] "Space" is the brain's perception of the sound at its source point, *e.g.*, the
    sound stage.

28

8.     To determine whether there was a difference between the sounds in an original recording and those in a simulation, I copied as a WAV file a one second clip from the re-mastered copy of the famous Beatles song, "Revolution." I then took the comparable one second clip from BlueBeat's simulation in the same WAV format. Both works were then converted into binary format for review. I compared the two binary expressions and observed that they were of different lengths and contained markedly different data sequences, indisputably establishing that the two contain sounds which are disparate and dissimilar from one another. Attached hereto and marked as **Exhibit B** are the first five pages of the two binary expressions from the two versions of "Revolution."[7] I have also attached, as **Exhibit C** a binary comparison screen shot which displays the differences in red and the similarities in black.

When propagated to the human ear and processed by the brain, the new sounds contain some parameters, such as loudness and rhythm, that may be perceived to resemble those in the original recordings, while others, like pitch, timbre and space may be perceived as markedly different. During the process of creating the simulations, all five artistic parameters of sound are adjusted by the human operator. The adjustment is not a mechanical process, but a subjective, interpretative one. The result is an **original** sound recording that reflects the artistic opinion of the operator: A live, original performance within a specially created virtual 3-D staging environment.

9.     Between 2002 and 2003, I created and subsequently destroyed more 70,000 psychoacoustic simulations, because they did not meet my artistic expectations of what a live musical performance should sound like.

---

[7] The complete binary print out have 595 and 712 pages respectively. These complete printouts will be furnished under separate cover

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

539380

5

CV 09 08030 JFW (JCx)

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

EX A PG 7

Case 2:09-cv-08030-JLS-JC   Document 16   Filed 11/16/2009   Page 8 of 11

### D.   Development of Secure X1

10.   In 2001, I began the design and creation of a Secure Copy Management System ("SCMS") as described in Chapter 10 of Title 17.  The SCMS I developed has been called Secure X1 and serves to protect performances of digital audio transmissions and audio visual displays from being serially copied and transmitted over the internet.  I have filed over 60 applications for patent on this technology, and have been awarded five patents by the U.S. Patents Office to date.  Attached hereto as **Exhibit D** are true and correct copies of the first pages of each.

11.   Beginning in late 2002, MRT entered into non-disclosure agreements with the major record labels, including Plaintiffs, and the Recording Industry Association of America ("RIAA"), the labels' trade association.  The purpose of the non-disclosure agreement was to demonstrate the effectiveness of the Secure X1 technology when used at a new broadcasting site, soon to be called BlueBeat.  I personally demonstrated the prototype BlueBeat audio visual display site and delivery methods and discussed psychoacoustic simulation with the RIAA and some of its member companies in Washington, D.C. on January 4, 2003.  Mr. Steve Marks, counsel for RIAA, and Mr. Carlos Garza, CTO of RIAA, were present.  Attached and marked hereto as **Exhibit E** are the nondisclosure agreements.

12.   By March, 2003, MRT, RIAA and the International Foundation Phonographic Industry ("IFPI"), parent organization of RIAA, had entered into a software evaluation license for the purpose of testing my SCMS to insure royalty payments.  Attached and marked hereto as **Exhibit F,** is the software evaluation license.

### E.   Creation of BlueBeat Website

13.   The BlueBeat website is a non-interactive service whose displays are educational, multi-media works that include history, biographies, original art, slide shows, visualizations and the sounds that accompany those works, for the purpose of informing and enlightening its users about music, culture, history and the arts.  It is

**ROBINSON & WOOD, INC.**
ATTORNEYS AT LAW

539380

CV 09 08030 JFW (JCx)

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

EX A PG 8

free to the public.  BlueBeat obtained section 112 and 114 statutory licenses as well as interactive publishing licenses from ASCAP, BMI, and SESAC.  It has paid all applicable royalties to copyright holders.   Attached hereto and marked as **Exhibit G** are BlueBeat's section 112 and 114 licenses.

14.     BlueBeat operates as a non-interactive service because the programming on each of its 3 channels does not substantially consist of sound recordings performed within 1 hour of the request or at a time set by either BlueBeat or its users. The 3 channels are: Time Machine with 189 programs; killer playlists with 287 programs; and Be the DJ which has 3700 programs. A BlueBeat user with a valid account is granted, fair use access to listen to a particular song from BlueBeat's audio visual service, to enable the user to create new audio visual performances that BlueBeat may transmit to the public at large. The "DJ" can listen to a song and press the little + button on the album page and the song will be added to the DJ's intended performance. If the DJ changes his mind, he can undo the work from his performance. He can only listen to the newly created performance when he has finished his production and has informsed BlueBeat that the performance is ready for transmission and display to the public at large. Once that occurs, BlueBeat will display the new work on the site so the public at large can enjoy the new performance. BlueBeat programs the new work to comply with the section 114 "sound recording performance compliment" rules which govern channel transmissions.  Each channel is programmed not to perform sound recordings within 1 hour of the request or at a time set by BlueBeat or any user.

15.     Be the DJ has been in use since 2005 and BlueBeat has paid all required royalties to ASCAP EMI, SESAC and SoundExchange for use of their works at the statutory rate. Although BlueBeat is required to pay only one royalty to a given performance rights group for the underlying composition, it paid 3 royalties for each performance to ASCAP, BMI and SESAC. BlueBeat did this to ensure that

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

7

CV 09 08030 JFW (JCx)

EX A PG 9

1  each composer/songwriter was paid. Attached and marked as **Exhibit H** are

2  exemplar reports of triple payments for the Beatles from 2007.

3      16.    BlueBeat transmitted its audio visual works either as downloads or

4  streams, from 2004 to present. All files include anti-circumvention technological

5  measures to protect each work from copying as part of the patented SCMS.

6  Embedded on every BlueBeat transmission file is an encrypted "security thread,"

7  similar to that found in a hundred dollar bill.  Contained within the thread are

8  copyright management directions so that every device the file encounters can act in

9  accordance with the usage requirements specific to the work transmitted.

10      17.    The BlueBeat audio visual player is a device, not contained on the main

11  BlueBeat site pages, unlike Pandora or Myspace. The A/V Player allows a user

12  remote access to all of the site's works, including biographies, slide shows, artwork,

13  DJ Channels, etc. A user activates the BB player by pressing PLAY for programs on

14  the main site. The device then opens as a small separate window that can  be

15  displayed on the user's screen or dragged onto a different screen. It plays the

16  BlueBeat audio visual work and lists the program, artist of the underlying sound

17  recording or composer, title of the sound recording, and song name.  There is a

18  More Info button on the A/V player that can be clicked by the user which remotely

19  accesses the BlueBeat main site and opens the BlueBeat Album Page. This page

20  includes licensed album art, genre information, CD label, CD release date,

21  composers and contributing artists for each track.

22      18.    To acquire and display this much audiovisual  material was a costly and

23  time consuming production, but the RIAA and EMI required that such information

24  be displayed on the Album.   BlueBeat worked with RIAA, EMI, Sony, Warner

25  Brothers and Universal to create a display standard that would satisfy their needs for

26  promotion and credit for their works. Meetings began in mid 2002 for their project,

27  and I worked directly with  Carlos Garza,. Chief Technology Officer at RIAA.

28

**ROBINSON & WOOD, INC.**
ATTORNEYS AT LAW

539380

8

CV 09 08030 JFW (JCx)

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY
INJUNCTION

19.    RIAA , EMI , the Labels and  MRT agreed on a display standard for BlueBeat so that the simulated mp3 files could be properly encoded with the meta-data to display and credit the underlying works produced by BlueBeat. The royalties to be paid to EMI and the other labels would be at the statutory rate charged under the 114 license. To facilitate the additional encoding and production , BlueBeat obtained Licenses to display photographs, album art, biographies and other materials from Amazon, Barnes and Noble, Corbis and All Music Guide

20.    Just prior to the launch of the BlueBeat webcast service, MRT entered into confidential agreements with the major record labels, including Plaintiffs, permitting each record label to evaluate the BlueBeat service to determine whether there was any non-licensed or infringing material on the site.  Attached as **Exhibit I** is a true and correct copy of the confidential agreements.  The labels were provided special password protected accounts, granting them private access to the entire site prior to the public launch.  During this evaluation period, I disclosed to EMI that the sound recordings to be transmitted by BlueBeat as part of audio visual displays were created independently by simulation and delivered not by conventional streaming, but by direct download, encrypted to permit one play only.  EMI was encouraged to test the effectiveness of the SCMS incorporated into each audio visual display transmission.  It did so and notified me that MRT's SCMS was 100 percent effective.  EMI explicitly approved the site for public launch.  During this testing and approval process, BlueBeat worked with Ted Cohen, V.P. of Digital Development and Distribution, Ken Parks, Ralph Munson and Richard Cotrell, head of anti-piracy at EMI.

21.    Following the demonstration of the SCMS on the BlueBeat prototype, Mr. Richard Gooch, Chief Technical Officer of the IFPI, requested that MRT modify its SCMS to accommodate the windows media audio (WMA) file format. That was accomplished in early, 2006.

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

539380

9                    CV 09 08030 JFW (JCx)

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

EX A PG 11

22.    During the evaluation process of the pre-public launch of the BlueBeat site, EMI, RIAA and the Labels  approved the additional required information and art on the BlueBeat Album page with direct access to these materials from the remote BlueBeat Audio Visual Player. Ted Cohen, told me at a meeting in Los Angeles that these additional materials promoted their works and would ensure accurate royalty payments. EMI and RIAA  and the Labels wanted BlueBeat to incorporate back-end server meta-data for broadcast transmission verification for accurate royalty payments. EMI informed me that without such  back-end server information, BlueBeat might its transmitting created our independently multi-media works outside the scope of its statutory license. BlueBeat complied with the request at great  time and expense to the company and has provided and continues to provide accurate royalty reports to SoundExchange and to the music publishers since its public launch in 2004.  Attached hereto and marked as **Exhibit J**.

23.    In 2005, Plaintiffs and other labels granted BlueBeat the first experimental international webcasting license through Phonographic Performance Limited ("PPL"), the UK equivalent of Sound Exchange.  Attached hereto and marked as **Exhibit K** is the PPL license agreement.

24.    In 2006, the PPL granted a license for Be the DJ as a non-interactive service for transmission to England.  Attached as **Exhibit L** is a true and correct copy of the license and email confirming its non-interactive service.

25.    BlueBeat's website includes a disclosure on each and every page of its site (there are over a million such pages) that "BlueBeat transmits simulated live musical performances at 160 and 320 kbs."  Attached hereto and marked as **Exhibit M** is a copy of a screen shot of one such disclosure.

26.    BlueBeat obtained copyright registration for over one million audio visual works.  These works consist of slide shows, biographies, album at, etc. and the sounds related to them.  Attached hereto and marked as **Exhibit N** is a true copy of the copyright registration issued to me for said audio visual works.  BlueBeat

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

539380

10

CV 09 08030 JFW (JCx)

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

EX A PG 12



1  discloses on each page of the site the following:  "All audio-visual works copyright

2  see 2009 (reg.PAu3-407-524 BlueBeat, Inc., a subsidiary of MRT."

3

4       I declare under penalty of perjury under the laws of the United States of

5  America that the foregoing is true and correct.

6       Executed on this 10th day of November, 2009 at San Jose, California.

7

8                                    _____/s/_____

9                                    HANK RISAN, Individually and as
                                     Chief Executive Officer of
10                                   BlueBeat.com, Inc.
                                     Media Rights Technologies, Inc.
11                                   BaseBeat.com, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINSON & WOOD, INC.
ATTORNEYS AT LAW

539380

11                              CV 09 08030 JFW (JCx)

DECLARATION OF HANK RISAN IN OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

EX A PG 13

# EXHIBIT B

# EXHIBIT B

1855149.1



PR Newswire
United Business Media

Send a release
Member sign in
Become a member
For journalists
Global sites

**Search**          Advanced Search

○ Products & Services   ○ News Releases

→

Products & Services          Knowledge Center          Browse News Releases          Contact PR Newswire

See more news releases in: Computer Electronics, Multimedia & Internet, Entertainment, Radio, Legal Issues

**Featured Video**

# Media Rights Technologies Enjoins RIAA to Prevent Demise of Internet Radio



Vlingo Introduces 'ActionBar' and Integrates with KAYAK, Fandango and Open Table

👍 Like It



Share ⌄          Print          Email

RSS

Blog it ⌄

Blog Search ⌄

SANTA CRUZ, Calif., March 7 /PRNewswire/ -- The Library of Congress Copyright Royalty Board has released its decision to substantially raise royalty rates paid by Internet Radio providers. If upheld, the judgment will have devastating consequences. In many cases these new royalty rates would approximate 130% of gross revenues to companies like Pandora, Live 365, Sirius, XM Radio and BlueBeat.com. The fatal effects to this nascent industry will damage even the largest of players such as iTunes and Yahoo.

In recent hearings, SoundExchange has cited stream ripping as a primary reason for the rate increase, arguing lessened CD and legal download sales. While it is true that stream ripping jeopardizes the entire music industry, increasing royalty rates will only discourage lawful webcasting while strengthening the illegal base of stream ripping software.

Proven technology exists which eradicates this epidemic and is far more profitable for the music industry than rate increases. Media Rights Technologies (MRT) has spent four years perfecting an effective solution to stream ripping that is simple and elegant to deploy. MRT's Secure X1 technology protects all Internet streams from piracy without affecting the consumer experience. X1 has been vetted and presented to Congress by the RIAA, however the trade association has been remiss in their failure to adopt it.

Over 100 million stream ripping programs now in the public domain continue to cost the labels billions of dollars in lost annual revenues, while for a fraction of that amount a proven solution could be implemented. Since 2003, MRT has consistently demonstrated the efficacy of X1 at www.BlueBeat.com, which has eliminated stream ripping of its globally webcasted content.

MRT CEO Hank Risan adds, "Solving the stream ripping problem by increasing royalty rates makes no sense. A reasonable and nondiscriminatory solution has been made available to the recording industry for many years. It's time for the music community to realize revenue and stop passing the buck."

About Media Rights Technologies
Media Rights Technologies, www.mediarightstech.com, creates and licenses content management and enablement solutions, empowering the effective distribution of digital content: entertainment, personal, commercial, or educational. In addition MRT is a leading developer of intellectual property focused on technologies that enable the commercial success of digital media distribution.

Contact: Quake Cox at Media Rights Technologies, +1-831-426-4412, or quake@mediarightstech.com.

SOURCE Media Rights Technologies

Back to top

**Other News Releases in Computer Electronics**

VirtualTone Integrates Web-Based Phone System with ConnectWise

University of Dayton Names Finance Professional Larry Heller R I S E  X1 Executive Director

ARRIS Hires Industry Veteran Don Toft to Head Comcast Account Team

**Journalists and Bloggers**

Visit PR Newswire for Journalists for releases, photos, ProfNet experts, and customized feeds just for Media.

View and download archived video content distributed by MultiVu on The Digital Center.

About PR Newswire | Contact PR Newswire | PR Newswire's Terms of Use Apply | Careers | Privacy | Site Map | RSS Feeds | Blog
Copyright © 1996-2010 PR Newswire Association LLC. All Rights Reserved.
A United Business Media company.

print    e-mail    link          RSS    Technorati    Blog Search    share it    blog it

**MRT Asks Congress to Hold Apple and Microsoft Accountable for Piracy**



Stream Ripping from iTunes for Use on an iPhone. (PRNewsFoto/Media Rights Technologies)

SANTA CRUZ, CA UNITED STATES

SANTA CRUZ, Calif., June 29 /PRNewswire-USNewswire/ -- The following is being issued by Hank Risan, CEO of Media Rights Technologies (MRT):

As the developer of the only effective digital copyright protection on the market, I am shocked to see the deliberate avoidance of protections mandated by U.S. Copyright Law.

(Photo: **http://www.newscom.com/cgi-bin/prnh/20070629/AQF074** )

Earlier this year, Copyright Royalty Board Judges determined that stream ripping and serial copying justify the recent arbitrated royalty rate hikes for Internet broadcasting. Every piece of copyrighted media delivered online without protection is fully exposed to piracy. Chapters 1, 10, 11 and 12 of Title 17 of the U.S. Copyright Act clearly state the requirement for anti-piracy technologies; yet the most prominent and influential content delivery services including Real Music, Yahoo, iTunes and MSN Music defy the law, endangering our most valuable asset: American Intellectual Property. And now they have the temerity to ask Congress for discounted royalty rates.

A deep dedication to the creative arts has driven MRT to develop and deploy SeCure X1, our powerful copy control technology which eliminates stream ripping and serial copying of digital content. The RIAA has vetted SeCure X1, conducted stringent tests, and deemed it 100% effective as an anti-piracy solution. MRT and RIAA then made Microsoft, Adobe, Real Networks and Apple Inc. fully aware of SeCure X1, but as device manufacturers as well as content distributors, these corporations clearly have no interest in protecting the material they deliver, regardless of The Digital Millennium Copyright Act. MRT will file an injunction for massive copyright infringement against these four device manufacturers because they have circumvented existing technologies, allow for and induce piracy of intellectual property. Over 10 billion iPods, iPhones, Zunes, Flash Players, Windows Media Players, Real Players and other devices from these manufacturers account for 98% of digital distribution, thereby causing billions of dollars in losses to the digital media industry. For example, Apple's iPhone will be released today at AT&T stores enabling internet broadcasts to be stream ripped directly from iTunes and transmitted to the phone, royalty free. All of these devices must either be immediately redesigned or removed from the market.

SeCure X1 is implemented on BlueBeat.com, making BlueBeat the only music service online that adheres to Copyright Law. It is immune to piracy's ever-growing threat, and as such should not be treated in the same manner as the mega-distributors, who are in effect handing out perfect copies of copyrighted content for redistribution to anyone with online access.

The higher royalty rates determined by the CRB are due to piracy, and should apply to those who refuse to protect their content against serial

EX B PG 15

copying. Anti-piracy technology is available and effective, and can be easily implemented. Companies that circumvent or refuse this solution should be held accountable for Industry losses and should face criminal sanctions from The Department of Justice. Companies that have properly safeguarded their distributed material should not be subject to the same fees as the blatant infringers.

In its crucial time of need, American Copyright Law has been abandoned and neglected. In order for a distributor to be eligible for a rate discount, they should be required to implement technological measures to protect copyright. If the Internet Radio Equality Act is signed into law without provisions for anti-piracy technologies, mega-distributors will continue to abuse the system and the cost of piracy will be borne by the American people. More importantly, a prime opportunity to properly protect American Intellectual Property will have been squandered.

Media Contacts:
Quake Cox, Media Rights Technologies
831-426-4412, quake@mediarightstech.com

---

SOURCE Media Rights Technologies

---

 **back to top**

**Related links:**
- http://www.mediarightstech.com

**Photo Notes:**
NewsCom: http://www.newscom.com/cgi-bin/prnh/20070629/AQF074
AP Archive: http://photoarchive.ap.org AP PhotoExpress
Network: PRN7 PRN Photo Desk, photodesk@prnewswire.com

**CONTACT:**
Quake Cox of Media Rights Technologies,
+1-831-426-4412, quake@mediarightstech.com

---

**POWERED BY Technorati** ○ **Blogs Discussing This News Release**

---

Issuers of news releases and not PR Newswire are solely responsible for the accuracy of the content.
Terms and conditions, including restrictions on redistribution, apply.
Copyright © 1996- 2010 PR Newswire Association LLC. All Rights Reserved.
A United Business Media company.

EX B PG 16

# EXHIBIT C

# EXHIBIT C

1855149.1

1  RUSSELL J. FRACKMAN (SBN 49087),
   rjf@msk.com
2  MARC E. MAYER (SBN 190969),
   mem@msk.com
3  EMILY F. EVITT (SBN 261491),
   efe@msk.com
4  MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
5  Los Angeles, California 90064-1683
   Telephone: (310) 312-2000
6  Facsimile: (310) 312-3100

7  Attorneys for Plaintiffs

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  CAPITOL RECORDS, LLC, a Delaware limited liability company; CAROLINE RECORDS, INC., a New York Corporation; EMI CHRISTIAN MUSIC GROUP INC., a California Corporation PRIORITY RECORDS, LLC, a Delaware limited liability company; VIRGIN RECORDS AMERICA, INC., a California Corporation; and NARADA PRODUCTIONS, INC., a Wisconsin corporation,<br><br>18              Plaintiffs,<br><br>19              v.<br><br>20  BLUEBEAT, INC., a Delaware corporation, doing business as www.bluebeat.com; MEDIA RIGHTS TECHNOLOGIES, INC., a California corporation; BASEBEAT, INC., a Delaware corporation, doing business as www.bluebeat.com; and HANK RISAN, an individual; and DOES 1 through 20,<br><br>24              Defendants. | CASE NO.  CV-08-8030 JST (JCx)<br><br>The Honorable Josephine Staton Tucker<br><br>**DECLARATION OF ALASDAIR MCMULLAN IN SUPPORT OF MOTION OF PLAINTIFFS FOR PARTIAL SUMMARY JUDGMENT ON THE FIRST, SECOND, THIRD, AND FOURTH COUNTS**<br><br>**Exhibits 1-3 and 5-12 Filed Herewith; Exhibit 4 Filed Separately; and Exhibits 13-28 Filed Under Seal**<br><br>[Memorandum of Points and Authorities, Statement of Uncontroverted Facts and Conclusions of Law, Declarations of James D. Berkley, Emily Evitt, Pietro Perona, Bruce Ward, Thomas Schlum and Marc Mayer Filed Concurrently Herewith]<br><br>Date:        October 4, 2010<br>Time:       10:00 a.m.<br>Ctrm:       16 (Spring Street Courthouse)<br><br>Trial:  December 14, 2010<br>Pre-Trial Conference: Nov. 19, 2010 |

Mitchell
Silberberg &
Knupp LLP

2876332.1

28

DECLARATION OF ALASDAIR MCMULLAN IN SUPPORT OF MOTION OF PLAINTIFFS FOR PARTIAL
SUMMARY JUDGMENT ON THE FIRST, SECOND, THIRD, AND FOURTH COUNTS

# DECLARATION OF ALASDAIR MCMULLAN

I, Alasdair McMullan, the undersigned, hereby declare:

1.      I am the Executive Vice-President of Legal Affairs of EMI Music North America ("EMI"). I have been employed by EMI since 1995. In my capacity as in-house counsel for EMI, among other things, I manage and supervise litigation for EMI and its record label affiliates, including but not limited to Capitol Records, LLC (formerly Capitol Records, Inc.), Caroline Records, Inc., EMI Christian Music Group Inc., Priority Records, LLC, Virgin Records America, Inc., and Narada Productions, Inc. (collectively the "EMI Record Companies" or "Plaintiffs"). In connection with my employment at EMI, I have become familiar with the books and records of EMI, including documents such as copyright certificates and agreements (including those referenced in this Declaration) pursuant to which EMI possesses rights in its sound recordings. I make this declaration in support of Plaintiffs' Motion for Summary Judgment against BlueBeat, Inc., Media Rights Technologies, Inc., BaseBeat, Inc., and Hank Risan (collectively "BlueBeat" or "Defendants"). If called upon to do so, I could and would competently testify to the matters stated herein.

2.      Plaintiffs are engaged in the business of producing sound recordings and distributing, selling, and/or licensing the production, distribution, sale, and performance of their sound recordings in phonorecords, in audiovisual works, and for streaming and downloading over the Internet. Plaintiffs invest substantial time, money, effort and creative talent in discovering and developing recording artists, and in creating, advertising, promoting, selling and licensing their catalog of sound recordings.

Mitchell
Silberberg &
Knupp LLP
2888093.2

EX C PG 18

3.     Plaintiffs are the owners of copyrights in and to a catalog of sound recordings first fixed after February 15, 1972 (the "Copyrighted Recordings"). Among the Copyrighted Recordings owned by EMI are each of the recordings identified in Exhibit 1 to this Declaration.

4.     EMI also possesses exclusive ownership rights in sound recordings of musical performances that were initially "fixed" (i.e., recorded) prior to February 15, 1972 ("Pre-1972 Recordings"). Among the Pre-1972 Recordings owned by EMI are each of those identified in the Schedule attached as Exhibit 2 to this Declaration. Among the Pre-1972 Recordings are all of the sound recordings by the Beatles, including the recently released "remastered" (and sonically improved) editions of the Beatles' original recordings.

## THE COPYRIGHTED RECORDINGS

5.     As the owner of copyrights in the Copyrighted Recordings, EMI possesses (and exploits) their exclusive rights, among other things, to reproduce the Copyrighted Recordings in copies or phonorecords, to distribute copies or phonorecords of the Copyrighted Recordings to the public, to perform the Copyrighted Recordings publicly by means of a digital audio transmission, and to license these exclusive rights, including the exercise of these rights over the Internet. EMI has obtained Certificates of Copyright Registration in each of the Copyrighted Recordings.

6.     EMI also owns copyrights in original cover artwork and images with which the Copyrighted Recordings have been sold and marketed (the "Copyrighted Artwork"). Certain of the SR Certificates attached hereto as Exhibits 4 through 12 specifically provide that they include registration for the Copyrighted Artwork.

Mitchell
Silberberg &
Knupp LLP

2888093.2

EX C PG 19

For ease of reference, those Certificates of Copyright Registration that include the Copyrighted Artwork have been designated as such in the column entitled "Cover Art" in Exhibit 1 to this Declaration.

7.     I will next discuss the ownership of the Copyrighted Recordings by each of the individual EMI Record Companies.

## Capitol Records, Inc.

8.     Attached to this declaration as Exhibit 3 is a spreadsheet identifying 624 sound recordings in which plaintiff Capitol Records, LLC ("Capitol"), and/or its affiliates own copyrights (the "Capitol Recordings"). Each of the Capitol Recordings has been registered with the U.S. Copyright Office. True and correct copies of the Certificates of Copyright Registration for the Capitol Recordings (or, in a few limited cases printouts from the Copyright Office website reflecting the existence of these Certificates) are attached to this declaration, collectively, as Exhibit 4.

9.     Capitol Records, LLC formerly was known as Capitol Records, Inc. On April 1, 2008, Capitol Records, Inc. was converted into an LLC, and its name was changed to Capitol Records, LLC.  375 of the Certificates of Copyright Registration for the Capitol Recordings reflect that Capitol Records, LLC, Capitol Records, Inc., or a "division" of Capitol Records is the "copyright claimant."

10.    249 of the Certificates of Copyright Registration for the Capitol Recordings do not identify Capitol as the "copyright claimant."  Capitol owns or controls the copyright in all of the works listed in these registrations.  For purposes

Mitchell
Silberberg &
Knupp LLP

2888093.2

3

EX C PG 20

of clarification, I shall briefly explain how Capitol derived its copyright ownership
in these sound recordings:

(a)    Certain of the Certificates of Copyright Registration for the
Capitol Recordings identify either SBK Records, Capitol Nashville, Blue Note,
EMI Latin, EMI Records Group, or Angel Records as the "copyright claimant."
SBK, Capitol Nashville, Blue Note, EMI Latin, EMI Records Group, and Angel
Records are fictitious business names (or d/b/a's) under which Capitol conducts
business.  The Copyright Act permits registrations under fictitious business names.

(b)    Certain of the Certificates of Copyright Registration for the
Capitol Recordings identify "EMI Records, Ltd.," "EMI Music Brazil, Ltd," "EMI
Music France," or "Toshiba/EMI" as the "copyright claimant."  Each of these
entities are current or former foreign affiliates of Capitol.  Capitol owns or controls
exclusive U.S. rights to such recordings by virtue of a written intra-company
license agreement (referred to internally as the Matrix Exchange Agreement, or
"MEA").  Pursuant to the MEA, Capitol is the exclusive licensee in the United
States of the sound recordings owned by each of these affiliated foreign companies
(and, as the exclusive licensee, has full rights to enforce the copyrights under the
Copyright Act).

(c)    42 of the Certificates of Copyright Registration for the Capitol
Recordings identify "Chrysalis Records" or "Chrysalis Records, Inc." as the
"copyright claimant." On December 23, 1993, Terwright Records, Inc., a
California corporation that was the sole owner of the Chrysalis catalog of sound
recordings, merged with and into Capitol Records, Inc.  As a result of this merger,
Capitol is the direct holder of all of the Chrysalis' assets, including its catalog of
sound recordings.

Mitchell
Silberberg &
Knupp LLP

2888093.2

4

1    (d)    20 of the Certificates of Copyright Registration for the Capitol

2    Recordings identify either "Liberty Records" or "United Artists Records, Inc." as

3    the "copyright claimant."  In 1978, Capitol acquired all of the stock and assets of

4    United Artists Records, Inc., which previously had acquired the catalog of sound

5    recordings formerly owned by Liberty Records.  Liberty Records, United Artists

6    Records, Inc., and Liberty/UA, Inc. were merged into Capitol Records, Inc. on

7    March 19, 1981.

8

9    (e)    16 of the Certificates of Copyright Registration for the Capitol

10   Recordings identify one of the following individuals or entities as the "copyright

11   claimant": "Anita Baker" (1 Certificate), "Babyshambles" (1 Certificate), "Umlaut

12   Corp." (1 Certificate), "DFA" (1 Certificate), "Venusnote" (1 Certificate), "Nemo

13   Studios" (3 certificates), "Robert Prizeman" (1 Certificate), and "Les Disques Du

14   Catalogues" (1 Certificate).  Each of these individuals or entities are affiliated with

15   certain specific recording artists, respectively, Anita Baker, Babyshambles, George

16   Harrison, LCD Soundsystem, Depeche Mode, Sarah Brightman, Libera, and

17   Telepopmusik.  Capitol (or one of its foreign affiliates) has entered into exclusive

18   agreements with each of these entities, pursuant to which Capitol has exclusive

19   rights in the United States (either directly or through the MEA) in these recordings

20   and has full rights to enforce the copyrights under the Copyright Act.

21

22   (f)    3 of the Certificates of Copyright Registration for the Capitol

23   Recordings identify "Tritec Music, Ltd" as the "copyright claimant" for recordings

24   embodying the recording artist "Duran Duran."  On September 22, 1988, EMI

25   Records Limited purchased all of the assets of Tritec Music Limited.  Capitol is the

26   exclusive licensee of these recordings in the United States pursuant to the MEA.

27

28

(g)     1 of the Certificates of Copyright Registration for the Capitol Recordings identifies "IRS Records" as the "copyright claimant" for the recording artist "Dread Zeppelin." On March 27, 1992, "Seventh Avenue Music, Inc." purchased all of the assets of "International Record Syndicate, Inc." On March 30, 1993, Seventh Avenue Music, Inc. merged into Capitol Records, Inc. As a result of the merger, Capitol is the direct holder of all of the assets of Seventh Avenue Music, Inc., including its catalog of sound recordings.

(h)     1 of the Certificates of Copyright Registration for the Capitol Recordings identifies "Enigma Records" as the "copyright claimant" for the recording artist "Hurricane." On April 1, 1989, Capitol-EMI Music, Inc., entered into an Asset Purchase and Joint Venture Agreement with Enigma Entertainment Corporation (on January 1, 1993, Capitol Records, Inc. was substituted for Capitol-EMI Music, Inc. as the shareholder of the joint venture). On September 30, 1994, Enigma Entertainment Corporation was formally dissolved and Capitol is the successor in interest to certain assets of the joint venture, including the Hurricane recordings at issue.

(i)     1 of the Certificates of Copyright Registration for the Capitol Recordings identifies "Pendulum Records" as the "copyright claimant" for the recording artist "Digable Planets." On August 16, 1993, Capitol Records, Inc. entered into an agreement with Rogli Entertainment Corp. for the creation of a joint venture between the parties known as Pendulum Records. On December 15, 1995, Capitol Records, Inc. and Rogli Entertainment Corp. entered into an agreement whereby the joint venture was terminated and all of the assets of the joint venture were transferred to Capitol, including the above referenced Digable Planets recordings.

Mitchell
Silberberg &
Knupp LLP

2888093.2

6

EX C PG 23

1

## __Caroline Records, Inc.__

2

3    11.    Attached to this declaration as Exhibit 5 is a spreadsheet identifying

4  26 sound recordings in which plaintiff Caroline Records, Inc. ("Caroline") and/or

5  its affiliates own copyrights (the "Caroline Records Recordings"). Each of the

6  Caroline Records Recordings has been registered with the U.S. Copyright Office.

7  True and correct copies of the Certificates of Copyright Registration (or, in a few

8  limited cases printouts from the Copyright Office website reflecting the existence

9  of these Certificates) for the Caroline Recordings are attached to this declaration,

10  collectively, as Exhibit 6.

11

12    12.    7 of the Certificates of Copyright Registration for the Caroline

13  Recordings identify Caroline as the "copyright claimant." 19 of the Certificates of

14  Copyright Registration for the Caroline Recordings do not identify Caroline as the

15  "copyright claimant." Caroline owns the copyright in all of the works listed in

16  these registrations. For purposes of clarification, I shall briefly explain how

17  Caroline derived its copyright ownership in these sound recordings:

18

19       (a)    2 of the Certificates of Copyright Registration for the Caroline

20  Recordings list "Astralwerks" or "Astralwerks Records" as the "copyright

21  claimant" on the copyright registration certificate. Astralwerks is a fictitious

22  business name (or d/b/a) under which Caroline conducts business.

23

24       (b)    8 of the Certificates of Copyright Registration for the Caroline

25  Recordings list "Source/Virgin France," "EMI Music Canada," or "EMI Music

26  Norway" as the "copyright claimant." Each of these entities are foreign affiliates

27  of Caroline. Pursuant to the MEA, Caroline is the exclusive licensee in the United

Mitchell
Silberberg &   28
Knupp LLP

2888093.2

7

EX C PG 24

1   States of the sound recordings owned by each of these affiliated foreign
2   companies.

3

4           (c)    2 of the Certificates of Copyright Registration for the Caroline
5   Recordings identify "XL Recordings" as the "copyright claimant" on the copyright
6   registration certificate for the recording artist Basement Jaxx.  Caroline possesses
7   exclusive U.S. rights in these recordings pursuant to an exclusive license
8   agreement between XL Recordings Ltd. and Astralwerks.

9

10          (d)    4 of the Certificates of Copyright Registration for the Caroline
11  Recordings identify "Skint Records" as the "copyright claimant" on the copyright
12  registration certificate for the recording artist "Fatboy Slim."  Caroline possesses
13  exclusive U.S. rights in these recordings pursuant to an exclusive license
14  agreement it has with Skint Records Ltd.

15

16          (e)    1 of the Certificates of Copyright Registration for the Caroline
17  Recordings identifies "Moshi Moshi Music Ltd, c/o EMI Music North America" as
18  the "copyright claimant" on the copyright registration certificate for the recording
19  artist "Hot Chip."  Caroline possesses exclusive U.S. rights in these recordings
20  pursuant to an exclusive license agreement between Astralwerks and Moshi Moshi
21  Records.

22

23          (f)    1 Certificate of Copyright Registration for the Caroline
24  Recordings identifies "Mawlaw 388 trading as Source UK" as the "copyright
25  claimant" on the copyright registration certificate for the recording artist "Audio
26  Bullys."  Mawlaw 388 Limited owns the copyright in and to these Audio Bullys
27  Recordings pursuant to an exclusive artist agreement.  Mawlaw 388 is an affiliate

28

Mitchell
Silberberg &
Knupp LLP

2888093.2

8

of Virgin Records Ltd.  Caroline is the exclusive licensee of these recordings in the United States pursuant to the MEA.

    (g) 1 Certificate of Copyright Registration for the Caroline Recordings identifies "Echo Label Ltd." as the copyright claimant for the recording artist "Bat For Lashes."  EMI Records Limited owns the copyright in and to these Bat For Lashes Recordings pursuant to an exclusive artist agreement between EMI Records Limited and The Echo Label Limited.  Caroline is the exclusive licensee of these recordings in the United States pursuant to the MEA.

### EMI Christian Music Group, Inc.

    13. Attached to this declaration as Exhibit 7 is a spreadsheet identifying 11 sound recordings in which plaintiff EMI Christian Music Group, Inc. and/or its affiliates own copyrights (the "EMI Christian Recordings").  Each of the EMI Christian Recordings has been registered with the U.S. Copyright Office.  True and correct copies of the Certificates of Copyright Registration for the EMI Christian Recordings (or, in a few limited cases printouts from the Copyright Office website reflecting the existence of these Certificates) are attached to this declaration as Exhibit 8. Each of the EMI Christian Recordings is registered in the name of "Forefront Communications."  In 1996, Capitol Records, Inc. purchased all of the stock and assets of The Forefront Communications Group, Inc.  On March 31, 2007, The Forefront Communications Group, Inc. merged into and with EMI Christian Music Group, Inc.

Mitchell
Silberberg &
Knupp LLP

2888093.2

9

EX C PG 26

Document 91     Filed 03/05/10     Page 11 of 18     Page ID #:2040

## Priority Records LLC

14.     Attached to this declaration as Exhibit 9 is a spreadsheet identifying 19 sound recordings in which plaintiff Priority Records LLC and/or its affiliates own copyrights (the "Priority Recordings"). Each of the Priority Recordings has been registered with the U.S. Copyright Office. True and correct copies of the Certificates of Copyright Registration for the Priority Recordings (or, in a few limited cases printouts from the Copyright Office website reflecting the existence of these Certificates) are attached to this declaration as Exhibit 10.

## Virgin Records America, Inc.

15.     Attached to this declaration as Exhibit 11 is a spreadsheet identifying 246 sound recordings in which plaintiff Virgin Records America, Inc. ("VRA"), and/or its affiliates own copyrights (the "VRA Recordings"). Each of the VRA Recordings has been registered with the U.S. Copyright Office.   True and correct copies of the Certificates of Copyright Registration for the VRA Recordings (or, in a few limited cases printouts from the Copyright Office website reflecting the existence of these Certificates) are attached to this declaration as Exhibit 12.

16.     Certain of the Certificates of Copyright Registration identify VRA or one of its subsidiaries or divisions (including "Narada Productions, Inc.," "Virgin Classics," and "Higher Octave Music, Inc.") as the "copyright claimant."

17.     Certain of the Certificates of Copyright Registration do not identify VRA as the "copyright claimant." VRA owns the copyright in all of the works listed in these registrations. For purposes of clarification, I shall briefly explain how VRA derived its copyright ownership in these sound recordings:

Mitchell
Silberberg &
Knupp LLP

2888093.2

10

EX C PG 27

Case 2:09-cv-08030-JLS-JC   Document 91   Filed 09/03/10   Page 12 of 18   Page ID
#:2041

1          (a)    7 of the Certificates of Copyright Registration for the VRA

2  Recordings list "Charisma Records America, Inc." as the "copyright claimant" on

3  the copyright registration certificate.  Charisma Records America, Inc., a New

4  York corporation, merged with and into VRA on March 31, 2004.  As a result of

5  the merger, VRA is the direct holder of all of the assets of Charisma Records

6  America, Inc., including its catalog of sound recordings.

7

8          (b)    70 of the Certificates of Copyright Registration for the VRA

9  Recordings list "Virgin Records, Ltd.," "Virgin Records Espana, SA," "Virgin

10  Records Norway," "Virgin France," "Circa Records, Ltd," "EMI Music Germany,"

11  "EMI Music France," and "Source" as the "copyright claimant" on the copyright

12  registration certificate.  Each of these entities are foreign affiliates of VRA.  VRA

13  is the exclusive licensee of these recordings in the United States pursuant to the

14  MEA.

15

16          (c)    2 of the Certificates of Copyright Registration for the VRA

17  Recordings list "Daft Lite" or "Daft Trax" as the "copyright claimant" on the

18  copyright registration certificate for the recording artist "Daft Punk."  Virgin

19  Records Limited, which is a foreign affiliate of VRA, owns the copyright in and to

20  these Daft Punk Recordings pursuant to an exclusive artist agreement.  VRA is the

21  exclusive licensee of these recordings in the United States pursuant to the MEA.

22

23          (d)    8 of the Certificates of Copyright Registration reflect either

24  "Dene Jesmond Enterprises, Ltd." (1 Certificate), "Jaydone Ltd." (3 Certificates),

25  "David Bowie" (3 Certificates), and "Jones Music & Labyrinth Entertainment" (1

26  Certificate) as the copyright claimants for the recording artists Bryan Ferry, KT

27  Tunstall, David Bowie, and Massive Attack, and the "Labyrinth" motion picture

EX C PG 28

#:2042

1    soundtrack.  VRA is the exclusive licensee of these recordings in the United States

2    pursuant to the MEA.

3

4          (e)    2 Certificates of Copyright Registration for the VRA recordings

5    reflect "Aircheology c/o EMI Music North America" or "Record Makers c/o EMI

6    Music North America" as the "copyright claimant for the recording artist "Air."

7    VRA is the exclusive licensee of these recordings in the United States pursuant to

8    the MEA.

9

10                        **THE PRE-1972 RECORDINGS**

11

12         18.    Capitol is the owner of each of the Pre-1972 Recordings.  This can be

13    confirmed, for example, by the screenshots of the BlueBeat Website

14    (www.bluebeat.com), including those collected by James Berkley and Bruce Ward,

15    in which the Pre-1972 Recordings are identified as being owned by Capitol or one

16    of its affiliated entities.  In addition, Capitol's ownership of these recordings can be

17    confirmed via publicly available information included in such sources as

18    www.allmusic.com (a music reference website known as "Allmusic" and/or the

19    "All Music Guide").  The All Music Guide is frequently and customarily used in

20    the industry to identify the label or imprint on which recordings were released.

21

22         19.    In addition to the foregoing, attached hereto as Exhibits 15 through 31

23    are true and correct copies of relevant portions of contracts between EMI (or its

24    predecessors) and the artists (or their representatives), conveying rights in the Pre-

25    1972 Recordings, as follows:

26

27         (a)    Exhibit 13:  Contracts dated November 12, 1963 and April 1, 1967,

28    between Andrew Hill and Blue Note Records, and extensions to such contracts.

Mitchell
Silberberg &
Knupp LLP

2888093.2

                                    12

EX C PG 29

#:2043

1      (b)    Exhibit 14:  Contracts dated October 2, 1958, October 2, 1960,

2  February 16, 1962, February 7, 1964, and July 24, 1964, between Art Blakey, on

3  the one part, and Blue Note Records and/or United Artists Records, Inc., on the

4  other part, and extensions to such contracts.

5

6      (c)    Exhibit 15:  Contract dated May 18, 1959, between Bill Evans and

7  United Artists Records, Inc.

8

9      (d)    Exhibit 16:  Contract dated February 20, 1963, October 15, 1967,

10  between John Patton and Blue Note Records, and an extension to the 1967

11  contract.

12

13      (e)    Exhibit 17: Contracts dated January 1, 1953, January 1, 1954, January

14  1, 1957, January 1, 1958, November 1, 1965, between Chet Baker, on the one part,

15  and Pacific Jazz Record Co., Pacific Enterprises, Inc., World Pacific, and Liberty

16  Records, Inc., on the other part, and extensions to the 1965 contract.

17

18      (f)    Exhibit 18:  Contracts dated August 12, 1948, December 21, 1951,

19  and February 2, 1959, between Dean Martin and Capitol Records, Inc.

20

21      (g)    Exhibit 19:  Contracts dated April 1, 1953, December 6, 1955, and

22  October 12, 1958, between Frank Sinatra and Capitol Records, Inc., and extensions

23  to the 1953 contract.

24

25      (h)    Exhibit 20:  Contracts dated February 4, 1961, February 4, 1964, and

26  August 15, 1969, between Grant Green, on the one part, and Blue Note Records,

27  and Liberty/UA, Inc., on the other part, and extensions to such contracts.

28

Mitchell
Silberberg &
Knupp LLP

2888093.2

EX C PG 30

Case 2:09-cv-08030-JST-JC   Document 91   Filed 09/03/10   Page 15 of 18   Page ID #:2044

1    (i)    Exhibit 21:  Contracts dated February 9, 1956, September 9, 1958,

2    February 8, 1962, and June 21, 1966, between Julie London and Liberty Records,

3    Inc.

4

5    (j)    Exhibit 22:  Contract dated October 1, 1966,  between Linda Ronstadt

6    (as part of the performing group "The Stone Poneys") and Capitol Records, Inc.

7

8    (k)    Exhibit 23:  Contract dated May 31, 1968, between Lonnie Smith and

9    Blue Note Records, Inc., and extensions to that contract.

10

11    (l)    Exhibit 24:  Contracts dated November 10, 1943, April 2, 1945,

12    March 20, 1946, March 28, 1946, May 15, 1946, August 1, 1947, October 15,

13    1947, December 15, 1947, January 15, 1949, January 31, 1949, January 16, 1952,

14    May 22, 1953, and September 9, 1954, between Nat King Cole and Capitol

15    Records, Inc.

16

17    (m)    Exhibit 25:  Contract dated October 24, 1967, between the artists

18    professionally known as "Quicksilver Messenger Service" and Capitol Records,

19    Inc., and certain extensions thereto.

20

21    (n)    Exhibit 26:  Contracts dated February 1, 1968, between the artists

22    professionally known as "the Band" and Capitol Records, Inc., and certain

23    extensions and amendments thereto.

24

25    (o)    Exhibit 27:  Contracts dated May 24, 1962 and July 16, 1962, between

26    the artists professionally known as the "Beach Boys" and Capitol Records, Inc.,

27    and certain extensions and amendments thereto.

28

Mitchell
Silberberg &
Knupp LLP

2888093.2

14

Case 2:09-cv-08030-JLS-JC   Document 171-1   Filed 12/27/10   Page 36 of 38   Page ID
#:2045

20.   Several of the contracts referenced above (and attached to this
Declaration) are between the artist and Blue Note Records, Liberty Records,
United Artists Records, Inc., or Liberty/UA, Inc.  Blue Note was a record label
founded in the late 1930s, known for releasing many classic jazz recordings
(including Art Blakey and Grant Green).  Liberty Records and United Artists
Records were record labels founded in the 1950s.  In or about 1965, Blue Note was
acquired by Liberty Records.  Liberty Records was subsequently acquired by
United Artists Records.  In 1979, EMI purchased United Artists Records, including
Liberty/UA, Inc., and Blue Note Records.  Capitol Records, LLC, currently owns
the master recordings formerly owned by United Artists, Blue Note, and Liberty
Records, including master recordings featuring Art Blakey, Andrew Hill, Big John
Patton, Bill Evans, Grant Green, Julie London, and Lonnie Smith.

21.   Attached, collectively, hereto as Exhibit 28 is a true and correct copy
of the relevant portions of certain documents pursuant to which Capitol possesses
exclusive rights in master recordings recorded by the Beatles.  This includes:

(a)   A contract dated June 4, 1962, between The Parlophone Company
Limited and Brian Epstein (former manager of the Beatles), and extensions thereto.

(b)   A contract dated January 26, 1967, between (a) The Gramophone
Company Limited, (b) NEMS Enterprises Limited and Brian Epstein, and (c)
George Harrison, John Lennon, James Paul McCartney, and Richard Starkey.

At the time the foregoing agreements were executed, The Parlophone Company
Limited and The Gramophone Company Limited were subsidiary record labels of
the EMI group of companies.  The Parlophone Company Limited formally
dissolved and EMI Records Limited, a foreign affiliate of Capitol, is the successor

EX C PG 32

Case 2:09-cv-08030-JLS-JC   Document 91   Filed 09/03/10   Page 17 of 18   Page ID
#:2046

1    in interest of all of its assets.  The Gramophone Company Limited formally

2    changed its name to EMI Records Limited on July 1, 1973.  Capitol is the

3    exclusive licensee of the Beatles' recordings in the United States pursuant to the

4    MEA.

5

6    **EMI AND BLUEBEAT**

7

8    22.    EMI has never authorized any of the Defendants to sell, distribute,

9    publicly perform, or otherwise exploit any sound recordings owned or exclusively

10    controlled by the EMI Record Companies on the BlueBeat Website, including via

11    digital download or digital streaming.

12

13    23.    I understand from Defendants' prior filings in this action that it has at

14    various times claimed that its representatives, including Hank Risan, engaged in

15    communications with representatives of the Recording Industry Association of

16    America, Inc. ("RIAA") concerning the BlueBeat Website.  EMI is a member of

17    the RIAA, which is a trade association for the recording industry.  The RIAA

18    represents the interests of the recording industry in various public relations and

19    legislative matters (such as with respect to legislation pending before Congress).

20    The RIAA also, on occasion, coordinates litigation by its record company members

21    on matters in which its members have a collective or shared interest (for example,

22    high-profile anti-piracy litigation, such as the litigation against Napster and

23    Grokster).  The RIAA is not a licensing body and does not possess the authority to

24    issue licenses on behalf of any of its members, to bind its members to contractual

25    agreements, or to authorize the use of any of its members' sound recordings by

26    third parties.  EMI specifically has never authorized the RIAA to enter into any

27

28

Mitchell
Silberberg &
Knupp LLP

2888093.2

EX C PG 33

Case 2:09-cv-08030-JLS-JC   Document 81   Filed 09/03/10   Page 18 of 18   Page ID #:2047

1    agreements or licenses on its behalf with respect to the use of EMI sound
2    recordings on the BlueBeat Website.
3
4        I declare under the penalty of perjury under the laws of the United States of
5    America that the foregoing is true and correct.
6
7        Executed this __2__ day of September, 2010, at New York, New York.
8
9
10                         Alasdair McMullan
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mitchell
Silberberg &
Knupp LLP

2879149.2

17